UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x
DR. OLIVER JOVANOVIC,

                    Plaintiff,

                -against-

THE CITY OF NEW YORK, DETECTIVE MILTON
BONILLA, Shield No. 61, individually and in his official
capacity, New York County Assistant District Attorney LINDA
FAIRSTEIN, individually and in her official capacity,
and New York County Assistant District Attorney
GAIL HEATHERLY, individually and in her official capacity,

                    Defendants.
--------------------------------------------------------------------------------x

**COMPLAINT**

**04 CV 8437 (CRC)**

**JURY TRIAL DEMANDED**

**ECF CASE**

       Plaintiff, DR. OLIVER JOVANOVIC, by his attorney, Jon L. Norinsberg, complaining of

the defendants, respectfully alleges as follows:

**PRELIMINARY STATEMENT**

       1.     Plaintiff brings this action for compensatory damages, punitive damages

and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of his civil

rights, as said rights are secured by said statutes and the Constitution of the United States.

**JURISDICTION**

       2.     This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the

Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

       3.     Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343 and 1367.

## VENUE

4.      Venue properly lies in the Southern District of New York under 28 U.S.C. § 1391(b), in that this is the District in which the claim arose.

## JURY DEMAND

5.      Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

6.      Plaintiff, DR. OLIVER JOVANOVIC ("OLIVER JOVANOVIC"), was at all relevant times a resident of the City and State of New York.

7.      Defendant, THE CITY OF NEW YORK, was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

8.      Defendant, THE CITY OF NEW YORK, maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, the City of New York.

9.      At all times hereinafter mentioned, the individually named defendant DETECTIVE MILTON BONILLA ("MILTON BONILLA") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

10.      Defendant, THE CITY OF NEW YORK, maintains the New York County District Attorney's Office, a municipal agency created and authorized under the laws of the State of New York to investigate and prosecute criminal conduct within the County and City of New York.

11.     At all times hereinafter mentioned defendant LINDA FAIRSTEIN ("FAIRSTEIN")
was the Chief of the Sex Crimes Unit of the New York County District Attorney's Office, and as
such, was responsible for the policies, practices and customs of the Sex Crimes Unit, as well as the
training, retention, supervision, discipline, counseling and control of the assistant district attorneys
who worked under her command and in this unit.

12.     At all times hereinafter mentioned, defendant GAIL HEATHERLY, was an officer,
employee and agent of the New York County District Attorney's Office, and an Assistant District
Attorney working under Defendant FAIRSTEIN in the Sex Crimes Unit.

13.     At all times hereinafter mentioned the defendants, either personally or through their
employees, were acting under color of state law and/or in compliance with the official rules,
regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

14.     Each and all of the acts of the defendants alleged herein were done by said
defendants
while acting within the scope of their employment by defendant City of New York.

15.     Each and all of the acts of the defendants alleged herein were done by said
defendants while acting in furtherance of their employment by defendant City of New York.

## **<u>FACTS</u>**

16.     On December 5, 1996, at approximately 11:00 a.m., plaintiff OLIVER
JOVANOVIC was lawfully inside of his apartment at 680 Fort Washington Avenue, in the County,
City and State of New York.

17.     At the aforesaid time and place, Defendant MILTON BONILLA, a detective with
the Special Victims Squad of the New York City Police Department, arrived at plaintiff's apartment.

18.     Thereafter, defendant MILTON BONILLA ordered plaintiff to get dressed and go with him to the 26th precinct for purposes of being interrogated.

19.     Defendant MILTON BONILLA refused to provide plaintiff OLIVER JOVANOVIC with any information as to the nature of this interrogation.

20.     Defendant MILTON BONILLA attempted to question plaintiff OLIVER JOVANOVIC without an attorney being present.

21.     When plaintiff OLIVER JOVANOVIC requested an attorney, he was immediately placed under arrest.

22.     At the time of his arrest, plaintiff OLIVER JOVANOVIC was a 30- year-old doctoral candidate at Columbia University who had previously earned a B.A. and M.S. from the University of Chicago, and an M.A. and M.Ph. from Columbia University.  He  had never before been arrested.

**The Allegations of the Complaining Witness**

23.     On November 27, 1996, the purported "victim", JAMIE RZUCEK ("RZUCEK") a 20-year-old Barnard College student, spoke with defendant MILTON BONILLA  and told him  that she had been sexually assaulted by plaintiff OLIVER JOVANOVIC for 20 hours, starting on the night of November 22, 1996 and continuing through the day of November 23, 1996.

24.     Specifically, RZUCEK claimed, inter alia, that plaintiff OLIVER JOVANOVIC: (1) had  raped and sodomized her; (2) had violently rammed a police baton into her anus and vagina, resulting in bleeding; (3) had struck her repeatedly with a club, resulting in multiple bruises to her thighs;  (4) had severely burned her with hot candle wax; (5) had bitten her breasts and shoulders until she bled profusely;  (6) had hogtied her against her will for nearly 20 hours; and (7) had repeatedly gagged her with a variety of materials, including duct tape, packing tape, cotton and an ace bandage.

**The Medical Findings**

25.     Each one of RZUCEK's claims was contradicted by medical evidence obtained within days of the alleged incident.

26.     On November 27, 1996, RZUCEK was given a comprehensive anal and vaginal examination by a gynecologist at Barnard Health Services, Dr. Chin Quee.

27.     Dr. Quee found no bruises, scratches or abrasions in the vaginal area, and no lacerations, bruises or fissures in the anal area.

28.     Dr. Quee found no vaginal bleeding and no rectal bleeding, even though RZUCEK told her she had experienced vaginal bleeding for three days.

29.     The results of a hemoccult test – a very sensitive test to detect traces of blood in the stool – were negative.

30.     There were no bruises on RZUCEK's thighs, no burn marks, no teeth marks and no scabbing, swelling, redness or tenderness in the nipple area.

**The Forensic Findings**

31.     There was also no forensic evidence to support any of RZUCEK's claims.

32.     Testing revealed that there was no trace of plaintiff's DNA found on RZUCEK, on her clothing, or on any of her undergarments worn on the night of the alleged assault.

33.     There was no blood found on any of RZUCEK's underclothing or on any of her clothes, despite her claim that she had bled profusely from her breasts, anus and vagina.

34.     There was no candle wax found on any of RZUCEK's garments and no burn marks were discovered on her body.

35.     There were no ligature marks found anywhere on RZUCEK's body, despite her claim that she had been hogtied for 20 hours and had thrashed violently against the ropes in an effort to escape.

36.     There were no abrasions, cuts or tape marks found on RZUCEK's lips or face, despite her claim that she had been repeatedly and violently gagged during the incident.

37.     The hair and fiber tests were negative, showing no signs of a violent struggle or sexual assault, although a pubic hair belonging to an unknown third party was found inside of RZUCEK's panties.

**The Credibility of the Accuser**

38.     Apart from the lack of any medical or forensic evidence, there were significant reasons to doubt RZUCEK's credibility.

39.     Within days of the purported incident, RZUCEK had given multiple and contradictory accounts of the alleged assault, changing critical facts each time she recounted the event.

40.     RZUCEK had a history of making false sexual allegations, and in fact had falsely accused her own father and uncle of sexual molestation.

41.     RZUCEK had also encouraged an acquaintance to file a false rape complaint against an NYU student only one week prior to the alleged incident.

42.     RZUCEK had waited almost four days before seeking any medical attention, despite her claims of experiencing profuse bleeding, severe burns and intense pain.

43.     RZUCEK did not speak with Barnard security, the police or any other law enforcement agency until four days after the alleged incident.

44.     After extensively interviewing RZUCEK on November 27, 1996, defendant MILTON BONILLA did not then place OLIVER JOVANOVIC under arrest, despite RZUCEK's claims of being brutally tortured, raped and sodomized.

45.     Defendant MILTON BONILLA waited 9 days prior to arresting plaintiff OLIVER JOVANOVIC.

46.     During this 9-day period, from the time of the initial complaint to the time of the arrest, defendant MILTON BONILLA conducted no further investigation into this matter.

47.     Notwithstanding the lack of any medical or forensic evidence, on December 5, 1996, defendant MILTON BONILLA arrested plaintiff OLIVER JOVANOVIC and charged him with committing multiple offenses, including Rape, Sodomy, and Unlawful Imprisonment.

48.     Defendant MILTON BONILLA arrested plaintiff OLIVER JOVANOVIC only after being pressured to do so by third parties.

**The Search of Plaintiff's Apartment**

49.     On December 5, 1996, after plaintiff was arrested, defendant MILTON BONILLA and several other police officers conducted a search of his premises, located at 680 Ft. Washington Avenue, Apartment 2F, in the City, County and State of New York.

50.     Police were looking to find the items which had allegedly been used by plaintiff in the attack against RZUCEK.

51.     Specifically, police were looking to find, inter alia, a police baton, candles, candle wax, a blindfold, cloth strips, duct tape, packing tape, and ace bandages.

52.     No such items were ever recovered from plaintiff OLIVER JOVANOVIC or his apartment.

53.     During this search, multiple photographs were taken of the interior of plaintiff's apartment.

54.     The photographs revealed that none of the items described in Paragraph "51", supra, were inside of plaintiff OLIVER JOVANOVIC's apartment.

55.     These photographs, taken by two separate investigative teams, were subsequently "lost" by defendant MILTON BONILLA and/or the New York City Police Department.

**Bonilla's Post-Search Activities**

56.      After the search was executed, defendant MILTON BONILLA prepared certain police reports and forwarded them to prosecutors in the New York County District Attorney's Office.

57.      These reports contained false and misleading information regarding the arrest of plaintiff OLIVER JOVANOVIC, as well as the evidence allegedly collected from his apartment.

58.      In addition to these  reports, defendant MILTON BONILLA told prosecutors from the New York County District Attorney's office  that he had observed certain incriminating evidence inside of  plaintiff's apartment, when he knew this claim to be untrue.

59.      Defendant MILTON BONILLA also told prosecutors  from the New York County District Attorney's office that plaintiff OLIVER JOVANOVIC had conspired to obstruct the police at the time of the search, and had destroyed certain incriminating evidence  prior to the search, when he knew these claims to be untrue.

60.      Thereafter, defendant MILTON BONILLA repeated the above false and misleading claims before the grand jury, the trial judge and the petit jury.

**The Arraignment**

61.      On December 6, 1996, plaintiff OLIVER JOVANOVIC was arraigned  before the Honorable Michael Gross, in the Criminal Court of the City of New York, County of New York, at 100 Centre Street.

62.      Defendant LINDA FAIRSTEIN ("FAIRSTEIN"), the Chief of the Sex Crimes Unit of the New York County District Attorney's Office, personally appeared at the arraignment of plaintiff OLIVER JOVANOVIC as the sole representative of that office.

**Defendant Fairstein's Post-Arraignment Statements to the Press**

63.     In the days following plaintiff OLIVER JOVANOVIC's arraignment, defendant FAIRSTEIN spoke to numerous news reporters and was quoted extensively in local newspaper articles.

64.     In these articles, defendant FAIRSTEIN made a number of highly inflammatory and prejudicial remarks about plaintiff OLIVER JOVANOVIC, none of which was true.

65.     The following statements in the articles were attributed directly to defendant FAIRSTEIN and illustrate the type of extrajudicial remarks that defendant FAIRSTEIN made to the press in the days following plaintiff's arraignment:

- "He terrorized this young woman to the point that she was too frightened to call the authorities until weeks after it happened";

- "He tied her to a chair, undressed her, and tortured her with sex toys and other objects for almost a full day";

- "[H]e tortured and sexually abused the woman, burning her with candle wax, biting her, sexually assaulting her and threatening to dismember her as Jeffrey Dahmer, the serial killer, had done with his victims";

- He "tied the woman's legs to a chair and gagged her before sexually torturing her";

- "[H]e was so prepared for this and carried it off so smoothly";

- "We believe this was not the first time he did something like this"; and

- "We believe there are other victims."

66.     Defendant FAIRSTEIN's comments made the headlines of all local newspapers. One New York Post cover page, for example, screamed "Prosecutor: Cyber fiend struck before" and "HOW MANY MORE VICTIMS?", while featuring a full page picture of plaintiff OLIVER JOVANOVIC.

67.     In addition to the foregoing, defendant FAIRSTEIN repeatedly emphasized  to the press that this was her office's "first Internet-related sex prosecution" and that the case represented a "whole new entry in the acquaintance-rape category."

**The Pre-Trial Publicity**

68.     Defendant FAIRSTEIN, through her extrajudicial statements to the press,  created a highly prejudicial and inflamed atmosphere against plaintiff OLIVER JOVANOVIC.

69.     In local newspapers, plaintiff OLIVER JOVANOVIC  became known as the "Cybersex Fiend" and "Cybersex Suspect", and his case became known as the "Cyber Torture" case.

70.     In the first two weeks after plaintiff's arrest, there were 76 articles in local newspapers which repeated defendant FAIRSTEIN'S false statements.  Plaintiff's case became a cover page story.

71.     In these articles, plaintiff OLIVER JOVANOVIC was repeatedly portrayed as a serial killer and "Cyberfiend", and was often compared with Jeffrey Dahmer.

72.     The "Cybersex" story was picked up by the Associated Press, which extensively quoted defendant FAIRSTEIN and her false allegations against plaintiff OLIVER JOVANOVIC.

73.     Major television networks and radio stations soon joined the coverage, and the story began to receive national and international attention.

74.     Throughout the pre-trial proceedings, defendant FAIRSTEIN continued to provide highly damaging "leaks" to the press, including but not limited to, releasing  select  portions of the e-mail  correspondence  between  plaintiff  OLIVER JOVANOVIC  and  RZUCEK  which  further demonized plaintiff.

75.     Defendant FAIRSTEIN knew that the pre-trial publicity that she had generated would have an impact on prospective jurors in the criminal trial of plaintiff OLIVER JOVANOVIC.

76.     In an interview given to the Media Studies Journal in the winter of 1998, just months prior to plaintiff OLIVER JOVANOVIC's trial, defendant FAIRSTEIN acknowledged the damaging impact that pre-trial publicity can have on prospective jurors:

> The period of greatest impact is pretrial because that could be anywhere from three months to a year.  Depending on the coverage, people can become immersed in reading about the case.  And from this reading-and-listening public come the people who sit on our juries.  After the trial has begun, the jurors are given a rule – that they don't read or listen to media accounts of the case.  Most people try hard to comply. *But it's almost impossible with the highest-profile cases for it to really happen.*
>
> When a case like Chambers, the jogger, the subway bomber or the World Trade Center bomber is on trial in New York –  and it is literally a page A1 headline – our jurors are coming to work on the subway and the bus .... I mean you can't sit on a train and not see what's there. ... *And you deal with a jury pool that is just saturated with that kind of information.*  You hope that you get jurors  who are telling you the truth, that they can set aside what they've heard and just listen to the evidence in the courtroom. In the end, both sides *use the press to great advantage before you get anywhere near the trial stage.*

(emphasis supplied)

77.     Defendant FAIRSTEIN acknowledged in the same interview that "it's inappropriate for prosecutors to be spinning the case to the media", and as a result,  "we don't try our cases on the courtroom  steps or to the press. We try them in the courtroom."

78.     Notwithstanding the above-stated policy, defendant FAIRSTEIN continued to make extrajudicial statements to the press and/or provide damaging "leaks" to the media throughout all phases of the criminal proceedings against plaintiff OLIVER JOVANOVIC.

79.     As a result of defendant FAIRSTEIN's conduct, the prejudicial news coverage continued up to and including the trial, and influenced the ability of the jury pool and the jurors who sat on the case to be fair and impartial, and also influenced the testimony of witnesses, jury deliberations, and, ultimately, the outcome of the case.

**The Verdict, The Appeal and The Subsequent Dismissal**

80.     On April 15, 1998, plaintiff OLIVER JOVANOVIC was convicted of Kidnaping in the First Degree, three counts of Sexual Abuse in the First Degree, Assault in the Second Degree and Assault in the Third Degree.

81.     Thereafter, the Honorable William A. Wetzel sentenced plaintiff OLIVER JOVANOVIC to 15 years to life in prison.

82.     On December 21, 1999, the Appellate Division of the New York State Supreme Court reversed plaintiff's conviction, finding inter alia, that Justice William A. Wetzel had "improperly hampered the defendant's ability to present a defense" by erroneously invoking the rape-shield law to deny the jury access to key evidence in the case.

83.     In anticipation of a second trial, the prosecution repeatedly offered plaintiff OLIVER JOVANOVIC plea deals in which he would avoid any further time in prison if he would plead guilty to a single felony charge.

84.     When plaintiff refused to consider any of these offers, the prosecution offered a plea deal in which plaintiff OLIVER JOVANOVIC would avoid any further incarceration, any felony record and any sex offender status if he would plead guilty to a single non-sexual, misdemeanor charge.

85.     Plaintiff OLIVER JOVANOVIC refused to accept this offer – despite facing a mandatory 15-year-to-life sentence on the felony Kidnapping charge – and insisted upon going forward with the second trial.

86.     On the eve of re-trial on  November 1, 2001, the prosecution  moved to dismiss all charges against plaintiff OLIVER JOVANOVIC.   The motion was granted.

87.     On November 1, 2001, all charges against plaintiff OLIVER JOVANOVIC were dismissed with prejudice.

**Plaintiff's Damages**

88.     As a result of his unlawful arrest and prosecution, plaintiff OLIVER JOVANOVIC was incarcerated for one week at Rikers Island prior to trial, and 20 months in Rikers Island and state prisons following his conviction.

89.     During this time, plaintiff OLIVER JOVANOVIC was repeatedly threatened and attacked by other inmates.

90.     On one occasion while in prison, plaintiff OLIVER JOVANOVIC was stabbed in the neck and had his throat slashed by another inmate, and came within inches of losing his life.

91.     Apart from the violence and hardships of prison life, plaintiff OLIVER JOVANOVIC suffered severe damage to his career and reputation.

92.     At the time of his arrest on December 5, 1996, plaintiff had completed his research at Columbia University for a Ph.D. degree in Microbiology, had written his doctoral thesis, and was scheduled to defend his thesis to the faculty on December 20, 1996.

93.     As a direct result of his unlawful arrest and prosecution, plaintiff OLIVER JOVANOVIC was prevented for over five years from defending his thesis and obtaining his Ph.D.

in Microbiology.

94.     It was not until May 7, 2002, that plaintiff OLIVER JOVANOVIC was able to defend his doctorate and earn a Ph.D. with distinction from Columbia University, as well as departmental honors for outstanding and innovative work.

95.     Notwithstanding this accomplishment, plaintiff OLIVER JOVANOVIC suffered substantial economic losses as a result of his unlawful arrest and prosecution,  including but not limited to, six years of lost wages as a specialist in computational biology.

96.     In addition, plaintiff OLIVER JOVANOVIC was forced to incur substantial attorneys' fees in connection with his defense, including but not limited to, legal fees for handling the trial, the appeal, and preparation for the second trial.

97.     Apart from  deprivation of liberty and economic losses, plaintiff OLIVER JOVANOVIC also suffered severe emotional distress and psychological damage as a result of defendants' unlawful actions, as well as  permanent and irreparable damage to his good name and reputation.

### FIRST CLAIM FOR RELIEF
### FALSE ARREST UNDER 42 U.S.C. § 1983

98.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "97" with the same force and effect as if fully set forth herein.

99.     As a result of defendant's aforesaid conduct, plaintiff OLIVER JOVANOVIC was subjected to an illegal, improper and false arrest by defendant MILTON BONILLA and was taken into custody and caused to be falsely imprisoned, detained, confined, incarcerated and prosecuted by the defendants in criminal proceedings, without any probable cause, privilege or consent.

-14-

100.     As a result of the foregoing, plaintiff's liberty was restricted for an extended period of time, he was put in fear for his safety, he was attacked by other inmates, he was physically and emotionally injured, he was repeatedly strip-searched and humiliated, and he suffered substantial economic losses and permanent damage to his reputation.

## SECOND CLAIM FOR RELIEF
## MALICIOUS PROSECUTION UNDER 42 U.S.C. § 1983

101.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "100" with the same force and effect as if fully set forth herein.

102.     Defendant MILTON BONILLA misrepresented and falsified evidence before prosecutors in the New York County District Attorney's office.

103.     Defendant MILTON BONILLA did not make a complete and full statement of material facts to prosecutors in the New York County District Attorney's office.

104.     Defendant MILTON BONILLA withheld exculpatory evidence from prosecutors in the New York County District Attorney's office.

105.     Defendant MILTON BONILLA misrepresented and falsified evidence before the grand jury.

106.     Defendant MILTON BONILLA did not make a complete and full statement of facts to the grand jury.

107.     Defendant MILTON BONILLA withheld exculpatory evidence from the grand jury.

108.     Defendant MILTON BONILLA was directly and actively involved in the initiation of criminal proceedings against plaintiff OLIVER JOVANOVIC.

109.     Defendant MILTON BONILLA lacked probable cause to initiate criminal proceedings against plaintiff OLIVER JOVANOVIC.

110.   Defendant MILTON BONILLA acted with malice in initiating criminal proceedings against plaintiff OLIVER JOVANOVIC.

111.   Defendant MILTON BONILLA was directly and actively involved in the continuation of criminal proceedings against plaintiff OLIVER JOVANOVIC.

112.   Defendant MILTON BONILLA lacked probable cause to continue criminal proceedings against plaintiff OLIVER JOVANOVIC.

113.   Defendant MILTON BONILLA acted with malice in continuing criminal proceedings against plaintiff OLIVER JOVANOVIC.

114.   Defendant MILTON BONILLA misrepresented and falsified evidence throughout all phases of the criminal proceeding.

115.   Notwithstanding the perjurious and fraudulent conduct of defendant MILTON BONILLA, the criminal proceedings were terminated in plaintiff's favor on November 1, 2001, when all charges against plaintiff OLIVER JOVANOVIC were dismissed with prejudice.

116.   As a result of the foregoing, plaintiff OLIVER JOVANOVIC was subjected to a baseless prosecution, his liberty was restricted for an extended period of time, he was put in fear for his safety, he was attacked by other inmates, he was physically and emotionally injured, he was repeatedly strip-searched and humiliated, and he suffered substantial economic losses and permanent damage to his reputation.

### THIRD CLAIM FOR RELIEF
### <u>MALICIOUS ABUSE OF PROCESS UNDER 42 U.S.C. § 1983</u>

117.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "116" with the same force and effect as if fully set forth herein.

118.   Defendant MILTON BONILLA issued legal process against plaintiff OLIVER JOVANOVIC.

-16-

119.     Defendant MILTON BONILLA issued legal process against plaintiff OLIVER JOVANOVIC to obtain a collateral objective outside the legitimate ends of the legal process.

120.     Defendant MILTON BONILLA acted with intent to do harm to plaintiff OLIVER JOVANOVIC, without excuse or justification.

121.     As a result of the foregoing, plaintiff OLIVER JOVANOVIC's liberty was restricted for an extended period of time, he was put in fear for his safety, he was attacked by other inmates, he was physically and emotionally injured, he was repeatedly strip-searched and humiliated, and he suffered substantial economic losses and permanent damage to his reputation.

**FOURTH CLAIM FOR RELIEF**
**DENIAL OF CONSTITUTIONAL RIGHT TO**
**FAIR TRIAL UNDER 42 U.S.C. § 1983 DUE TO FABRICATION OF EVIDENCE**

122.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "121" as if the same were more fully set forth at length herein.

123.     Defendant MILTON BONILLA created false evidence against plaintiff OLIVER JOVANOVIC.

124.     Defendant MILTON BONILLA  forwarded false evidence and false information to prosecutors in the New York County District Attorney's office.

125.     Defendant MILTON BONILLA misled the grand jury, the trial judge and the prosecutors by creating false evidence against plaintiff OLIVER JOVANOVIC and thereafter providing false testimony throughout the criminal proceedings.

126.     In creating false evidence against plaintiff OLIVER JOVANOVIC,  in forwarding false evidence and information to prosecutors, and in providing false and misleading testimony, defendant violated plaintiff's constitutional right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

127.    As a result of the defendant MILTON BONILLA'S unlawful actions, plaintiff OLIVER JOVANOVIC's liberty was restricted for an extended period of time, he was put in fear for his safety, he was attacked by other inmates, he was physically and emotionally injured, he was repeatedly strip-searched and humiliated, and he suffered substantial economic losses and permanent damage to his reputation.

### FIFTH CLAIM FOR RELIEF
### DENIAL OF FAIR TRIAL UNDER 42 U.S.C. § 1983 DUE TO
### EXTRAJUDICIAL STATEMENTS MADE BY THE PROSECUTION

128.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "127" as if the same were more fully set forth at length herein.

129.    Defendant FAIRSTEIN made extrajudicial statements to the press regarding OLIVER JOVANOVIC.

130.    Defendant FAIRSTEIN  knew that her extrajudicial statements about plaintiff OLIVER JOVANOVIC were false and/or misleading.

131.    Defendant FAIRSTEIN made such extrajudicial statements in order to gain an unfair advantage over plaintiff OLIVER JOVANOVIC at trial.

132.    Defendant FAIRSTEIN made such extrajudicial statements in order to create a "high-profile" case that would advance her own career goals and/or generate publicity for the sale of her crime novels.

133.    Defendant FAIRSTEIN knew that her extrajudicial statements about plaintiff OLIVER JOVANOVIC would be reported by various media outlets, including newspapers, radio stations and television networks.

134.    Defendant FAIRSTEIN knew that her extrajudicial statements about plaintiff OLIVER JOVANOVIC would create a highly prejudicial and inflamed atmosphere against plaintiff.

-18-

135.    As a result of defendant FAIRSTEIN's extrajudicial statements to the press, plaintiff OLIVER JOVANOVIC was the subject of extensive and highly prejudicial news coverage.

136.    This negative publicity influenced the ability of the jury pool and jurors who sat on the case to be fair and impartial, and also influenced the testimony of several important witnesses at trial and the deliberations of the jury.

137.    For example, one material witness, Mary Jo Parlier Chambers, testified about critical "facts" that she had actually learned from reading a newspaper article.

138.    These "facts", as testified to by Ms. Chambers, were addressed by both parties during summations and were the subject of a read-back requested by the jury during their deliberations.

139.    Throughout the trial, there were several other material witnesses whose testimony was influenced by the pre-trial publicity, including but not limited to Vida DeLeon, Steve Ralbovsky and Joseph Little.

140.    As a result of FAIRSTEIN's extrajudicial statements to the press, plaintiff OLIVER JOVANOVIC was denied his constitutional right to a fair trial, his liberty was restricted for an extended period of time, he was put in fear for his safety, he was attacked by other inmates, he was physically and emotionally injured, he was repeatedly strip-searched and humiliated, and he suffered substantial economic losses and permanent damage to his reputation.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF DUE PROCESS  UNDER 42 U.S.C. §  1983 THROUGH COERCION**
**AND INTIMIDATION OF DEFENSE WITNESSES**

141.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "140" as if the same were more fully set forth at length herein.

-19-

142.    Defendant GAIL HEATHERLY, in her investigative capacity, met with and interviewed several potential witnesses during her pre-trial investigation.

143.    Defendant GAIL HEATHERLY, in her investigative capacity, learned that these witnesses possessed material and exculpatory information which would be helpful to the defense.

144.    Defendant GAIL HEATHERLY, in her investigative capacity, specifically instructed these witnesses not to speak to with members of the defense team.

145.    Defendant GAIL HEATHERLY, in her investigative capacity, threatened to disclose embarrassing personal details about these witnesses if they agreed to cooperate with the defense team.

146.    As an example of the conduct alleged in paragraphs "141" through "144", defendant GAIL HEATHERLY met a witness named Kenneth Krompinger during the early phases of her investigation into this matter.

147.    Mr. Krompinger lived directly beneath plaintiff OLIVER JOVANOVIC and could easily hear noise from plaintiff's apartment, including people talking and walking.

148.    Mr. Krompinger told defendant GAIL HEATHERLY that he was home throughout the entire period of the alleged assault and that he never heard any screams from plaintiff OLIVER JOVANOVIC'S apartment.

149.    Mr. Krompinger further told defendant GAIL HEATHERLY that he recalled hearing a quiet back-and-forth conversation upstairs on the following day.

150.    The information provided by Mr. Krompinger was highly relevant and would have undercut RZUCEK's claim that she had been tortured and had been screaming on-and-off throughout the 20-hour ordeal.

151.    After speaking with Mr. Krompinger, defendant GAIL HEATHERLY threatened to expose Mr. Krompinger's medical and psychiatric history if he agreed to cooperate with the defense.

152.    After meeting with defendant GAIL HEATHERLY, Mr. Krompinger refused to speak with members of the defense team.   Accordingly, neither the defense nor the jury learned of Mr. Krompinger's exculpatory evidence.

153.    As a  result of defendant GAIL HEATHERLY's unlawful actions, plaintiff OLIVER JOVANOVIC was denied an opportunity to present material and exculpatory information at his criminal trial.

154.    As a result of defendant GAIL HEATHERLY's unlawful actions, plaintiff OLIVER JOVANOVIC was denied due process of law, his liberty was restricted for an extended period of time, he was put in fear for his safety, he was attacked by other inmates, he was physically and emotionally injured, he was repeatedly strip-searched and humiliated, and he suffered substantial economic losses and permanent damage to his reputation.

## SEVENTH CLAIM FOR RELIEF
## MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983

155.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "154" as if the same were more fully set forth at length herein.

156.    Defendants continued criminal proceedings against plaintiff despite a lack of credible evidence against him, and notwithstanding their knowledge that said proceedings would jeopardize plaintiff's liberty, well-being, safety and constitutional rights.

157.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, assistant district attorneys and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York, the

New York City Police Department, the New York County District Attorney's Office  and the Sex Crimes Unit, all under the supervision of ranking officers of said department, office and unit.

**I.      Extrajudicial Statements By the Prosecution in High-Profile Criminal Cases**

158.    At all times herein mentioned, defendant CITY OF NEW YORK, through the New York County District Attorney's office  and  the Sex Crimes Unit, had a custom, practice and policy of allowing assistant district attorneys to make extrajudicial statements to the press in high-profile criminal cases, so as to inflame public opinion against such defendants and deprive them of their constitutional right to a fair trial.

159.    The aforesaid policy, custom and practice can be inferred in part from repeated instances in which the New York County District Attorney's office,  through defendant FAIRSTEIN and/or assistant district attorneys in the Sex Crimes Unit acting under her supervision, engaged in the following tactics in high-profile criminal cases:

> (a)     Providing systematic "leaks"of information to the press which were damaging to the accused;
>
> (b)     Releasing to the press negative information about the accused, including his prior arrest history and criminal record;
>
> (c)     Publicly discussing the merits of the case and/or incriminating evidence which  had been gathered against the accused;
>
> (d)     Expressing opinions about the accused's guilt or innocence prior to the commencement of trial;
>
> (e)      Maligning the character and reputation of the accused;
>
> (f)     Stating that the accused had engaged in similar conduct before without evidence to  support such statements; and
>
> (g)     Commenting on the identity, testimony and/or credibility of prospective witnesses who would testify against the accused.

160.    The existence of the aforesaid customs, policies and practices of defendant

CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the

Sex Crimes Unit, is evident in the following high-profile criminal cases, among others:

(a) The "Cybersex Torture" Case;

(b) The "Central Park Jogger" Case;

(c) The "Preppie Murder" Case against Robert Chambers;

(d) The Sexual Abuse case against Dr. Patrick Griffin; and

(e) The Internet Sexual Assault case against Paul Krauth.

161.    In all of the above cases, prosecutors from the New York County District Attorney's

office made extrajudicial statements to the press which involved one or more of the improper tactics

enumerated in Paragraph "158", supra, and which resulted in extensive negative publicity against

the accused.

162.    The aforesaid policies, procedures, regulations, practices and/or customs

were implemented by policymaking officials for the defendant City of New York, including but not

limited to, the District Attorney of New York County Robert Morgenthau and/or defendant

FAIRSTEIN, who knew that:

(a)    to a moral certainty such policies, procedures, regulations, practices and/or

customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)    that such issues either present assistant district attorneys with difficult

choices of the sort that instruction, training and/or supervision would make less difficult, or that the

need for further instruction, training and/or supervision was demonstrated by a history of assistant

district attorneys' mishandling such situations; and

(c)     despite their knowledge of said policies, procedures, regulations, practices and/or customs, the supervisory and policymaking officers and officials of the defendant CITY OF NEW YORK, as a matter of policy, practice and custom, perpetuated or failed to take steps to terminate said policies, practices and/or customs, did not discipline or otherwise properly supervise the employees engaged in them, did not effectively instruct, train and/or supervise such personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead sanctioned the policies, procedures, regulations, practices and/or customs described above, and in fact rewarded such assistant district attorneys by giving them promotions and bonuses, thereby evincing a deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the State of New York.

163.    The foregoing customs, policies, usages, practices, procedures and rules of the the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Sex Crimes Unit, constituted a deliberate indifference to the safety, well-being and constitutional rights of all defendants in high-profile criminal cases, including but not limited to, plaintiff OLIVER JOVANOVIC.

164.    The foregoing customs, policies, usages, practices, procedures and rules of the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Sex Crimes Unit City of New York, were the proximate cause of the constitutional violations suffered by OLIVER JOVANOVIC as alleged herein.

165.    The foregoing customs, policies, usages, practices, procedures and rules of the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and Sex Crimes Unit City of New York, were the moving force behind the constitutional violations suffered

by plaintiff OLIVER JOVANOVIC as alleged herein.

166.    As a proximate result of the foregoing practices and policies of the CITY OF NEW

YORK, as implemented by the New York County District Attorney's office and the Sex Crimes

Unit, plaintiff OLIVER JOVANOVIC was denied his constitutional due process right to a fair trial

and was incarcerated unlawfully for more than 20 months until all charges were dismissed against

him on November 1, 2001.

**II**.    **"Off-the Record" Statements by NYPD Officials in High-Profile Criminal Cases**

167.    At all times herein mentioned, defendant CITY OF NEW YORK, through the

New York City Police Department, had a custom, practice and policy of allowing its police officers,

detectives and/or investigators to make "off-the-record" statements to the press in high-profile

criminal cases, thereby disclosing highly sensitive and/or damaging information from an ongoing

criminal investigation, so as to inflame public opinion against defendants in such cases and deprive

them of their constitutional right to a fair trial.

168.    The aforesaid policy, custom and practice can be inferred in part from repeated

instances in which the New York York City Police Department,  through its police officers,

detectives and/or investigators, engaged in the following tactics in high-profile criminal cases:

(a)    Providing systematic "leaks"of information to the press which were
damaging to the accused;

(b)    Releasing to the press negative information about the accused, including his
prior arrest history and criminal record;

(c)    Releasing to the press incriminating evidence which  had been gathered
against the accused;

(d)    Expressing opinions about the accused's guilt or innocence prior to the
commencement of trial;

(e)    Maligning the character and reputation of the accused;

> (f)    Stating that the accused had engaged in similar conduct before without evidence to support such statements; and
>
> (g)    Commenting on the identity, testimony and/or credibility of prospective witnesses who would testify against the accused.

169.    The existence of the aforesaid customs, policies and practices of defendant CITY OF NEW YORK, as implemented by the New York City Police Department, is evident in the following high-profile criminal cases, among others:

> (a) The "Cybersex Torture" Case;
>
> (b) The "Central Park Jogger" Case;
>
> (c) The "Preppie Murder" Case against Robert Chambers;
>
> (d) The Sexual Abuse case against Dr. Patrick Griffin; and
>
> (e) The Internet Sexual Assault case against Paul Krauth.

170.    In all of the above cases, law enforcement officials from the New York City Police Department, including but not limited, police officers, detectives, and/or investigators, made "off-the-record" statements to the press which involved one or more of the improper tactics enumerated in Paragraph "167", supra, and which resulted in extensive negative publicity against the accused which tainted the jury pool and deprived the accused of the constitutional right to a fair trial.

171.    The aforesaid policies, procedures, regulations, practices and/or customs were implemented by policymaking officials for the defendant City of New York, including but not limited to, the police commissioner(s) and/or other high-ranking officials of the New York City Police Department, who knew that:

> (a)    to a moral certainty such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)   that such issues either present police officers, detectives and/or investigators with difficult choices of the sort that instruction, training and/or supervision would make less difficult, or that the need for further instruction, training and/or supervision was demonstrated by a history of such employees' mishandling such situations; and

(c)   despite their knowledge of said policies, procedures, regulations, practices and/or customs, the supervisory and policymaking officers and officials of the defendant CITY OF NEW YORK, as a matter of policy, practice and custom, perpetuated or failed to take steps to terminate said policies, practices and/or customs, did not discipline or otherwise properly supervise the employees engaged in them, did not effectively instruct, train and/or supervise such personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead sanctioned the policies, procedures, regulations, practices and/or customs described above, and in fact rewarded such employees by giving them promotions and bonuses, thereby evincing a deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the State of New York.

172.   The foregoing customs, policies, usages, practices, procedures and rules of the the CITY OF NEW YORK, as implemented by the New York City Police Department, constituted a deliberate indifference to the safety, well-being and constitutional rights of all defendants in high-profile criminal cases, including but not limited to, plaintiff OLIVER JOVANOVIC.

173.   The foregoing customs, policies, usages, practices, procedures and rules of the CITY OF NEW YORK, as implemented by the New York City Police Department, were the proximate cause of the constitutional violations suffered by OLIVER JOVANOVIC as alleged herein.

-27-

174.    The foregoing customs, policies, usages, practices, procedures and rules of the CITY OF NEW YORK, as implemented by the New York City Police Department, were the moving force behind the constitutional violations suffered by plaintiff OLIVER JOVANOVIC as alleged herein.

175.    As a proximate result of the foregoing practices and policies of the CITY OF NEW YORK, as implemented by the New York City Police Department, plaintiff OLIVER JOVANOVIC was denied his constitutional due process right to a fair trial and was incarcerated unlawfully for more than 20 months until all charges were dismissed against him on November 1, 2001.

**III.    Deliberate Indifference to the Training and Supervision of Assistant District Attorneys**

176.    Apart from the foregoing practices and policies, defendant CITY OF NEW YORK exhibited a deliberate indifference toward the training and supervision of assistant district attorneys in the New York County District Attorney's Office, in that defendant CITY OF NEW YORK:

a)    Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to discontinue a criminal prosecution when medical and/or forensic evidence is discovered which negates probable cause and exonerates the accused;

b)    Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to discontinue a criminal prosecution when it becomes apparent that the complaining witness is not credible;

c)    Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to timely disclose all evidence favorable to the defense on the issues of guilt or innocence and punishment, pursuant to the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution, and to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny;

d)    Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to avoid threatening, intimidating, hiring and/or coercing potential defense witnesses and preventing them from testifying on behalf of the accused;

e)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to avoid interfering with a defendant's constitutional right to a fair trial by instructing potential defense witnesses to not speak with defense counsel or investigators for the defense team;

f)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to avoid pressuring potential defense witnesses to give untruthful, erroneous, incomplete and/or misleading statements;

g)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to avoid adopting a "win-at-all-costs" approach to trial which involves, inter alia, the following misconduct: coaching and/or permitting witnesses to give inaccurate, false and/or misleading testimony; tailoring witness testimony to explain inconsistencies with physical evidence; altering medical and forensic expert reports to exclude information which is favorable to the defense; and withholding material facts from medical and forensic experts to secure more favorable testimony from said experts; and

h)   Intentionally and/or recklessly failed to properly instruct, train and/or supervise assistant district attorneys with regard to their obligations to avoid giving improper summations which, inter alia: mistate evidence; discuss evidence which is not part of the record; mischaracterize witness testimony;  personally attack the accused and/or defense counsel; invite speculation by the jury; inflame the passions of the jury against the accused; and otherwise exceed the bounds of proper advocacy.

177.   The aforesaid deliberate indifference to the training and supervision of assistant district attorneys of the New York County District Attorney's Office may also be inferred in part from an examination of the following criminal cases handled by said office, among others:

(a)  The "Cybersex Torture" Case;

(b)  The "Central Park Jogger" Case;

(c) The "Preppie Murder" Case against Robert Chambers; and

(d) The Sexual Abuse case against Dr. Patrick Griffin.

178.   In all of the above cases, prosecutors from the New York County District Attorney's office engaged in one or more of the improper tactics enumerated in Paragraph "175", supra, and thereby deprived the accused of the constitutional right to a fair trial.

-29-

179.    The aforesaid deliberate indifference to the training and supervision of assistant district attorneys by defendant CITY OF NEW YORK  may also be inferred from an analysis of convictions obtained by the New York County District Attorney's office which have been reversed, modified, or vacated based, inter alia, upon prosecutorial actions of the sort described in paragraph 175, supra.

180.    The aforesaid deliberate indifference to the training and supervision of assistant district attorneys was implemented as a policy, practice, and/or custom of defendant CITY OF NEW YORK by policymaking officials for defendant CITY OF NEW YORK including, but not limited to, the District Attorney of New York County Robert Morganthau and/or defendant FAIRSTEIN, who knew that:

(a)    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)    that such issues either present assistant district attorneys  with difficult choices of the sort that instruction, training and/or supervision will make less difficult, or that the need for further instruction, training and/or supervision was demonstrated by a history of assistant district attorneys' mishandling such situations; and

c)    despite their knowledge of said policies, procedures, regulations, practices and/or customs, the supervisory and policymaking officers and officials of the defendant CITY OF NEW YORK, as a matter of policy, practice and custom, perpetuated or failed to take steps to terminate said policies, practices and/or customs, did not discipline or otherwise properly supervise the employees engaged in them, did not effectively instruct, train and/or supervise such personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead sanctioned the policies, procedures, regulations, practices and/or customs described above, and in fact rewarded such assistant district attorneys by giving them promotions and bonuses,

thereby evincing a deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the State of New York.

181.    The foregoing customs, policies, usages, practices, procedures and rules of the the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Sex Crimes Unit, constituted a deliberate indifference to the safety, well-being and constitutional rights of all defendants, including but not limited to, plaintiff OLIVER JOVANOVIC.

182.    The foregoing customs, policies, usages, practices, procedures and rules of the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Sex Crimes Unit City of New York, were the proximate cause of the constitutional violations suffered by OLIVER JOVANOVIC as alleged herein.

183.    The foregoing customs, policies, usages, practices, procedures and rules of the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and Sex Crimes Unit City of New York, were the moving force behind the constitutional violations suffered by plaintiff OLIVER JOVANOVIC as alleged herein.

184.    As a proximate result of the foregoing practices and policies of the CITY OF NEW YORK, as implemented by the New York County District Attorney's office and the Sex Crimes Unit, plaintiff OLIVER JOVANOVIC was denied his constitutional right to a fair trial and was incarcerated unlawfully for more than 20 months until all charges were dismissed against him on November 1, 2001.

**WHEREFORE**, plaintiff OLIVER JOVANOVIC demands judgment in the sum of ten million dollars ($10,000,000.00) in compensatory damages, ten million dollars  ($10,000,000.00) in punitive damages, plus attorney's fees, costs, and disbursements of this action.

Dated:   New York, New York
         October 27, 2004

                                          _____
                                          JON L. NORINSBERG (JN2133)
                                          Attorney for Plaintiff
                                          225 Broadway, Suite 2700
                                          New York, N.Y. 10007
                                          (212) 791-5396