UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

DR. OLIVER JOVANOVIC,

                              Plaintiff,

              -against-                          04-CV-8437 (PAC)

THE CITY OF NEW YORK, et al.,

                              Defendants.

------------------------------------------------------------------------ x

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 788-1599

<u>Of Counsel:</u>

Arthur G. Larkin

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT

I.    Governing Standards ................................................. 1

II.    Second Cause of Action - Malicious Prosecution ........................................ 2

    A.    Plaintiff Cannot Establish "Favorable Termination" .................................................. 3

    B.    Plaintiff Cannot Overcome the Presumption of Probable Cause .......................................... 4

III.    Plaintiff's Abuse of Process Claim Should be Dismissed ......................................................... 9

IV.    Denial of a Fair Trial - Alleged Fabrication of Evidence ......................................................... 10

V.    Fifth Claim - ADA Fairstein's Alleged Extrajudicial Statements ........................................................ 11

    A.    None of Ms. Fairstein's Alleged Statements Were Improper .................................................... 12

    B.    Jovanovic Cannot Show Proximate Cause ................... 16

    C.    Jovanovic Cannot Show the Absence of Other Remedies ........................................................ 16

    D.    Ms. Fairstein is Entitled to Qualified Immunity ................................................................ 19

VI.    Seventh Claim - Municipal Liability ........................................ 20

    A.    Deliberate Indifference - Systematic "Leaks" - DA's Office ................................................. 20

    B.    Deliberate Indifference - Systematic "Leaks" - NYPD ................................................. 21

    C.    Deliberate Indifference - DA's Office - Failure to Train ........................................................ 22

1.      Plaintiff Cannot Show any Violation
of his Rights Due to Conduct by the
Prosecutors ............................................................... 22

2.      The Trial Court's Rulings are a
Superseding Cause of any Purported
"Harm" to Jovanovic ........................................ 23

3.      Plaintiff Cannot Show any "Custom
or Practice" ....................................................... 23

4.      Plaintiff's Claims are Barred by *Van
de Kamp v. Goldstein* ..................................... 24

CONCLUSION ............................................................................................. 26

## Preliminary Statement

Defendants respectfully submit this memorandum of law in support of their motion for summary judgment. We refer the court to Defendants' Statement Pursuant to Local Civil Rule 56.1 ("Rule 56.1 Stmt."), for a recitation of the relevant, undisputed facts.

## Argument

## I.     Governing Standards

In order to be entitled to summary judgment, the moving party must demonstrate that "no genuine issue of material fact exists." *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 473 (S.D.N.Y. 2003), *aff'd*, 426 F.3d 549 (2d Cir. 2005); *see* Fed. R. Civ. P. 56(c). Once the moving party has discharged its burden, the non-moving party "must raise a genuine issue of material fact" that requires a trial. *Id.* In order to raise a genuine issue of fact, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts, . . . and she may not rely on conclusory allegations or unsubstantiated speculation." *Id.* at 473-74 (citations and internal quotes omitted). Rather, the non-moving party "must produce admissible evidence that supports her pleadings." *Id.* (citing *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289-90 (1968)). "Summary judgment is appropriate, . . . if the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, . . . or if it is based purely on conjecture or surmise." *Savino v. City of New York*, 331 F.3d 63, 71 (2d Cir. 2003) (citations and internal quotes omitted).

A motion for summary judgment requires the party with the burden of proof at trial to "make a showing sufficient to establish the existence of [each] element to that party's case, . . . since a complete failure of proof concerning an essential element of . . . [the] case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Applying these rules, the Second Circuit has stated:

> [T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.

*Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of <u>material</u> fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1996) (emphasis added).

## II. <u>Second Cause of Action - Malicious Prosecution</u>[1]

The law places "a heavy burden on malicious prosecution plaintiffs." *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004) (citing *Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 195 (2000)). In order to prove such a claim, plaintiff must establish four elements: "(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." *Savino*, 331 F.3d at 72 (citation omitted). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution" under New York or federal law. *Id.* (citing *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)). As shown below, plaintiff cannot establish (2) or (3) on this record, warranting summary judgment in favor of defendants.

---

[1]    Plaintiff's first cause of action, for false arrest, was dismissed as time-barred under *Wallace v. Kato*, 549 U.S. 384 (2007) (*see* DE 62).

## A.     <u>Plaintiff Cannot Establish "Favorable Termination"</u>

In order to establish a "favorable" termination, plaintiff must "demonstrate a final termination that is not inconsistent with innocence." *Rothstein*, 373 F.3d at 286 (citing *Cantalino v. Danner*, 96 N.Y.2d 391, 395 (2001)). Plaintiff cannot meet this burden here. Jovanovic was tried and convicted in 1998, of Kidnapping in the First Degree, a Class A Felony, and lesser included offenses. (Rule 56.1 Stmt., ¶ 176) The conviction was reversed on the ground that the trial court erroneously applied the Rape Shield Law to exclude certain evidence. *People v. Jovanovic*, 263 A.D.2d 182 (1st Dept. 1999). After remand, the People fully intended to retry Jovanovic and made preparations for the retrial.

However, on the date the retrial was scheduled to begin, the People moved to dismiss the indictment in the interests of justice because J.R.'s "present emotional state will not permit her to undergo the stress of a prolonged trial." (Exhibit NN, at 3:3-5) Significantly, in a prepared statement, the prosecutor informed the court: "[C]onsidering that this prosecution has gone on for five years, and that *the defendant has already served two years in prison as a result of his conviction last time*, we believe the interests of justice will be best served" by dismissal. (*Id.* at 3:15-19; emphasis added) The factors that led to dismissal were (1) the complaining witness' emotional state, which prevented her from testifying, and (2) the undisputed fact that Jovanovic "had received some punishment." (Rule 56.1 Stmt., ¶ 181) At no time did anyone in the District Attorney's Office believe that Jovanovic was innocent. (*Id.*, ¶ 182) We submit that termination under these circumstances is inconsistent with innocence, and is consistent with a determination by the authorities that Jovanovic was guilty and had already been punished.

In denying defendants' motion to dismiss the complaint, relying mainly on *Cantalino*, the court concluded that plaintiff had adequately pleaded the "favorable termination" prong of his

malicious prosecution claim (*see* DE 39, at 16). We respectfully submit that a different result is required now, because the evidence adduced in discovery makes clear the reasons for dismissal of the charges. This evidence was not before the court on defendants' motion to dismiss.

Finally, *Cantalino* is markedly distinguishable on the facts. There, the criminal charges against the plaintiff were dismissed in the interests of justice in a scathing decision by the trial judge, who concluded that "the charges against plaintiff were groundless," that she "clearly did not have the intent required to have committed the crime" for which she had been arrested, and that "the People will not be able to prove [plaintiff's guilt] beyond a reasonable doubt." *Cantalino*, 96 N.Y.2d at 393-94. Against this factual backdrop, the Court of Appeals adopted "[a] case-specific rule . . . for dismissals in the interest of justice, since the trial court is required to state on the record its reasons for dismissing the criminal charges." *Id.* at 396. Applying the "case specific rule" here, with reference to the reasons for the dismissal of the charge, we submit that plaintiff cannot establish a "favorable termination."

## B.  Plaintiff Cannot Overcome the Presumption of Probable Cause

It is well-settled that "indictment by a grand jury creates a presumption of probable cause that may <u>only</u> be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Savino*, 331 F.3d at 72 (emphasis in original; citation omitted); *see also McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006) (indictment "gives rise to a presumption that probable cause exists [for] the crimes described" in the indictment). Plaintiff bears the burden of proof in rebutting the presumption of probable cause. *Id.* at 73 (citing *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994)). In this connection, plaintiff must adduce evidence sufficient to "erode the premise that the Grand Jury acts judicially." *Rothstein*, 373 F.3d at 284 (citation omitted).

Plaintiff will likely argue that the presumption created by the indictment is overcome because Detective Bonilla testified falsely before the Grand Jury to facts suggesting that Jovanovic's mother destroyed evidence.[2] Accepting plaintiff's version arguendo, plaintiff cannot overcome the presumption for two reasons.

First, ten of the eleven counts in the indictment were based solely on evidence <u>other</u> than Bonilla's testimony about the candles. J.R. testified in vivid detail – and with great emotional difficulty, as is evident from the transcript – as to what Jovanovic did to her. (Rule 56.1 Stmt., ¶ 156; *see* Exhibit F) ADA Gail Heatherly then specifically charged the Grand Jury with regard to eleven separate offenses, only one of which concerned the candles. The remaining counts concerned Jovanovic's (i) restraining J.R. against her will, (ii) sodomizing her with a baton-like object, (ii) sexually abusing her by causing unwanted contact between his mouth and J.R.'s breast, his hand and J.R's vagina, and his hand and J.R.'s breast, and (iv) assaulting her by biting her breasts. (Rule 56.1 Stmt., ¶ 153; Exhibit GG) Because the alleged "false" testimony by Bonilla did not concern ten of the eleven counts, as a matter of law Jovanovic cannot show that Bonilla's testimony "erode[d] the premise that the Grand Jury act[ed] judicially" with regard to those ten counts. *See Rothstein*, 373 F.3d at 284.

Second, with regard to the assault count based on Jovanovic's using candle wax, Bonilla's purportedly "false" testimony is not enough to overcome the presumption. Under New York and federal law, more than an inconsistency between a police witness and other witnesses is required to defeat the presumption. *Cf. McClellan*, 439 F.3d at 146 (three separate inconsistencies in police witness' testimony, along with substantial evidence of personal animus

---

[2]    Bonilla testified in the Grand Jury that he told Jovanovic he needed his keys to execute the search warrant, that Jovanovic gave him the keys, that when he arrived at the apartment, Jovanovic's mother was inside, and that evidence he had seen earlier in the day – candles, which corroborated J.R.'s account of the crime – were missing. (Rule 56.1 Stmt., ¶¶ 129-35, 157; Exhibit FF) Jovanovic's mother denies that she destroyed or secreted evidence, and Jovanovic denies that he had any candles in his apartment in 1996.

held sufficient to overcome the presumption). "The existence of a swearing contest" between witnesses, standing alone, does not overcome the presumption or create a question of fact concerning probable cause. *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 422 (S.D.N.Y. 2002); *see also Colon*, 60 N.Y.2d at 83 (police officers' "failure to pursue the investigation is not the equivalent of fraud or the suppression of evidence . . . . Nor do variations in the witnesses' testimony prove perjury"). Here, at most, a "swearing contest" is presented between Detective Bonilla, on the one hand, and Oliver Jovanovic and his mother, Sabina, on the other. Without more, this conflict is not sufficient to overcome the "strong" presumption of probable cause. *Brogdon*, 200 F. Supp. 2d at 421; *see also Colon*, 60 N.Y.2d at 83 (trial court "may not weigh the evidence on which the police acted or which was before the Grand Jury after the indictment has issued"). Accordingly, Jovanovic cannot overcome the presumption.

Even if this court were to conclude that the presumption is, or may be overcome, as a matter of law there was probable cause to indict Jovanovic at the time the case was presented to the Grand Jury. Probable cause requires "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). When information is received from a victim or eyewitness, probable cause exists "unless the circumstances raise doubt as to the person's veracity." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001). Information provided by "an identified bystander with no apparent motive to falsify" the information has "a peculiar likelihood of accuracy." *Panetta*, 460 F.3d at 395 (citation omitted). "[A]n identified citizen informant is [therefore] presumed to be reliable." *Id.*

Here, the evidence in support of probable cause was substantial. J.R., the victim, explained in detail to Detective Bonilla the crimes that Jovanovic committed, and then wrote out

a statement describing those crimes.  (Rule 56.1 Stmt., ¶¶ 117-21)  She separately told four other individuals about Jovanovic's crimes, none of whom knew each other or spoke to each other about the incident:  Luke Dubois (*id.*, ¶¶ 53-64), Emily Powers (*id.*, ¶¶ 67-77), William O'Connor (*id.*, ¶¶ 86-90, 113), and Dr. Karlene Chin-Quee (*id.*, ¶¶ 91-103).  All of these witnesses later testified for the People and recounted J.R.'s story as "outcry witnesses" – none of them were told what to say by law enforcement authorities or anyone else.  (*Id.*, ¶¶ 169-75)  J.R. also reported the crime to her mother.  (*Id.*, ¶¶ 65-66)

In addition, a board certified obstetrician-gynecologist, Dr. Chin-Quee, examined J.R. on November 27, 1996, four days after she left Jovanovic's apartment.  The results of her examination were consistent with J.R.'s description of what Jovanovic did to her (which Dr. Chin-Quee learned when she took J.R.'s history).  (*Id.*, ¶¶ 104-12)  Her findings on examination included five separate bruises on J.R.'s body, cervical motion tenderness, adnexal tenderness, and rectal tenderness.  (*Id.*, ¶¶ 104-07)  Prior to examining J.R., Dr. Chin-Quee had experience treating victims of sexual assaults.  She believed that J.R. was credible, because she was hesitant, subdued, apprehensive and anxious, "not seeming like she actually wanted to be there, which is quite consistent with most alleged sexual assault victims."  (*Id.*, ¶ 111-12)

Jovanovic, in contrast, made no statement to detectives or prosecutors about the night of his date with J.R.  (*Id.*, ¶ 127)  The only "statements" available to prosecutors were his contemptuous e-mails to J.R. after the date, one of which asked rhetorically:  "Why do you think what happened happened?  Is it a good idea to go somewhere with someone you don't really know?  Do you really think you know what you're doing playing such games?  Do you know how to defend yourself?  Do you know much about sex or STD's?  *Did anything happen to you that you didn't ask for?*  Whose desires were fulfilled?  What exactly was revealed about whose

nature?" (*Id.*, ¶ 82; emphasis added) Nothing pointed to his innocence. Under the circumstances, objectively viewed, probable cause existed as a matter of law. *See Panetta*, 460 F.3d at 395; *Caldarola*, 298 F.3d at 162; *Curley*, 268 F.3d at 70.

Moreover, by the time the case had gone to the Grand Jury, prosecutors learned about three <u>other</u> women who reported behavior or statements by Jovanovic that was consistent with J.R.'s description of what he did to her. One woman, a former girlfriend, reported that Jovanovic attacked her in a strikingly similar fashion, tying her to a chair, dripping hot wax on her, sodomizing her with an object and taunting her about the serial killer Jeffrey Dahmer. (*Id.*, ¶¶ 144-45; <u>Exhibit DD</u>) Another publicly stated that after she ended a relationship with him in college, he stalked her, poured noxious chemicals under her door, locked her inside her dorm room and played other vicious pranks on her. (*Id.*, ¶¶ 146-50) A third woman reported to the FBI that Jovanovic had made statements to her about tying people up and using candle wax on them, as J.R. described his doing to her. (*Id.*, ¶¶ 151-52)

Finally, even after the Grand Jury indicted Jovanovic, law enforcement authorities obtained substantial corroborating evidence against him. Prosecutors saw his IM's stating that he enjoyed tying women to his futon, using candles and ice on them, and biting them, all of which corroborated J.R.'s allegations that he did the same things to her. (*Id.*, ¶¶ 161-63) His IM to SacredSoul on November 24, 1996, just hours after J.R. left his apartment – which Jovanovic admits refers to his encounter with J.R. – is powerful evidence that he restrained her inside his apartment against her will: "I tied her, then donning my best ominous look, asked her what would happen if I raped, dismembered and killed her . . . I pointed out that she hadn't told anyone where she was going, and we arrived at my place late, so no one saw us enter. . . . I let her dwell on that for a while." (*Id.*, ¶¶ 161(a)-(c)) ADA Heatherly and two detectives also

learned from school records that Jovanovic had been accused of cheating on three exams while a student at the University of Chicago, a highly unusual occurrence, and interviewed the persons who made the accusations. ADA Heatherly believed these allegations to be credible, and believed that they showed Jovanovic to be "quite dishonest." (*Id.*, ¶ 188; Exhibit CC)

In order to meet the probable cause test, it is not necessary that law enforcement officials "believe with certainty that the arrestee will be successfully prosecuted," *Curley*, 268 F.3d at 70, because their function "is to apprehend those suspected of wrongdoing, not to finally determine guilt through a weighing of the evidence." *Panetta*, 460 F.3d at 396 (citation omitted). Police officers, in other words, "are neither required nor allowed to sit as prosecutor, judge or jury." *Id.* (emphasis added; citation omitted). Since probable cause – a "complete defense" to the malicious prosecution claim, *see Savino*, 331 F.3d at 72 – exists here, defendants submit that summary judgment is warranted.

## III. Plaintiff's Abuse of Process Claim Should be Dismissed

"In New York, a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino*, 331 F.3d at 76 (citation omitted). "The crux of a malicious abuse of process claim is the collateral objective element." *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009). In order to establish a collateral objective, plaintiff must plead and prove that the defendant "aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Id.* (internal quotation marks and citation omitted). "[C]ollateral objectives typically associated with abuse of criminal process are extortion, blackmail, or retribution; and those objectives are usually characterized by

personal animus." *Oathout v. Decker*, No. 99 Civ. 5868 (KNF), 2000 U.S. Dist. LEXIS 12001, at \*20 (S.D.N.Y. Aug. 21, 2000).

Here, plaintiff alleges that Detective Bonilla arrested him because William O'Connor and Loraine Mohr called his superiors repeatedly asking that he be arrested, and that he feared for his job if he did not make the arrest (DE 40, ¶¶ 48-62). The available evidence, however, shows that these allegations cannot be proven at trial. (Rule 56.1 Stmt., ¶¶ 183-85) Moreover, since Bonilla had probable cause to arrest Jovanovic as a matter of law, the abuse of process claim must be dismissed. *E.g., Sforza v. City of New York*, 07 Civ. 6122 (DLC), 2009 U.S. Dist. LEXIS 27358, at \*49-50 (S.D.N.Y. Mar. 31, 2009) ("the presence of probable cause negates a claim for abuse of process, particularly the second element").

## IV. <u>Denial of a Fair Trial – Alleged Fabrication of Evidence</u>

A civil rights plaintiff may bring an action under Section 1983 against "a police officer [who] creates false information likely to influence a jury's decision and [who] forwards that information to prosecutors," because such conduct violates the accused's right to a fair trial. *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). The Second Circuit has only recognized a constitutional right "not to be deprived of *liberty* as a result of the fabrication of evidence" by an officer. *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000). Accordingly, plaintiff must show that Detective Bonilla fabricated evidence and that his fabrication was material to plaintiff's conviction. *Ricciuti*, 124 F.3d at 130 (fabrication must be "likely to influence a jury's decision").

We submit that, as a matter of law, Bonilla's testimony regarding the candles could not have deprived him of liberty. Jovanovic was found guilty of Kidnapping in the First Degree, P.L. § 132.25(2)(a), which requires proof that he abducted J.R. and restrained her for twelve (12)

or more hours with intent to inflict physical injury and to abuse her sexually. (Appendix Four, Defendant-Appellant's Brief, *People v. Jovanovic*, Indictment # 10938/96, at 2) He was also convicted of the lesser included offenses of First Degree Sexual Abuse (three counts), based on contact between (i) his mouth and J.R.'s breasts (Count Five), (ii) his hand and her vagina (Count Six), and (iii) his hand and her breasts (Count Eight), and was convicted of Third Degree Assault, for biting her breasts (Count Eleven). (*Id.*) His conviction on these counts alone was sufficient for the ultimate sentence imposed, fifteen (15) years to life. (Rule 56.1 Stmt., ¶¶ 176-77; Exhibit MM) Either the sexual abuse or the assault would have satisfied the elements of Kidnapping in the First Degree. *See* N.Y. Penal Law, § 132.25(2)(a) (elements are restraining another "with intent to . . . [i]nflict physical injury upon him *or* violate or abuse him sexually").

The evidence allegedly fabricated by Bonilla – which concerned missing candles – did not support Jovanovic's conviction of the foregoing crimes. Bonilla's brief testimony concerning the candles supported the conviction on Count Ten only, which charged Second Degree Assault based on Jovanovic's burning J.R. with candle wax. (Appendix Four, at 2) Put another way, even without Bonilla's brief testimony regarding the candles, Jovanovic would have been convicted of each of the other counts in the indictment described above and would have received the same prison sentence. The purported fabricated testimony therefore did not cause any deprivation of liberty, as a matter of law. *See Zahrey*, 221 F.3d at 349.

## V.     Fifth Claim – ADA Linda Fairstein's Alleged Extrajudicial Statements

In order to establish this claim, plaintiff must plead and prove that (1) Ms. Fairstein was directly responsible for "improper leaks," i.e., public disclosure of information covered by "the canons of ethics relating to prosecutorial functions and fair trial/free press," (2) the impermissible disclosures "*in fact* denied [plaintiff] his due process rights" to a fair trial, and (3)

other remedies, such as "voir dire, use of challenges both peremptory and for cause, . . . a motion to change venue, or the like" were not available or were used to no avail. *Powers v. Coe*, 728 F.2d 97, 105-6 (2d Cir. 1984) (emphasis in original) (hereafter "*Powers I*").

Plaintiff claims that he was denied a fair trial because of nine separate statements allegedly made by Assistant District Attorney Linda Fairstein, between December 7-9, 1996, approximately fifteen (15) months before the trial began. (*See* Rule 56.1 Stmt., ¶¶ 142(a)-(i)) This claim must be dismissed, as a matter of law, because (1) plaintiff cannot show that Ms. Fairstein's statements were improper, (2) plaintiff cannot show that he was injured in fact by any of Ms. Fairstein's statements, (3) plaintiff cannot show that other remedies were not available, and (4) Ms. Fairstein is entitled to qualified immunity.

## A.   None of Ms. Fairstein's Alleged Statements Were Improper

Ms. Fairstein appeared in court on just one occasion in this case, viz., at Jovanovic's arraignment on December 6, 1996. (Rule 56.1 Stmt., ¶ 140) She is entitled to absolute – not qualified – immunity for any and all statements she made at the arraignment. It is well-settled that "a prosecutor has absolute immunity . . . for his performance of tasks as an advocate in the conduct of the prosecution." *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996), *cert. denied*, 520 U.S. 1115 (1997) (citing *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976)). By appearing at the arraignment, Ms. Fairstein acted "as an advocate" conducting the prosecution.

The vast majority of news reports during December, 1996, which reflected statements by Ms. Fairstein simply repeated what she had said at the arraignment, either verbatim or in substance. We submit that, viewed in the light most favorable to plaintiff, only nine statements could reasonably be viewed as "extrajudicial" (Rule 56.1 Stmt., ¶ 142), and we further submit that none of these statements violated the relevant ethical rules. The rules in effect at the time

provided that a prosecutor should not "make an extrajudicial statement . . . if [she] knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicative proceeding in that matter." 22 N.Y.C.R.R. § 1200.38(a) [D.R. 7-107], eff. Sept. 1, 1990 (Thomson West 2008) (hereafter "DR 7-107").

First, Ms. Fairstein's statement that the case represents "a whole new entry in the acquaintance rape category" because it was the first sex crimes case where the complainant and assailant met on the Internet, was purely descriptive and accurate.[3] (Rule 56.1 Stmt, ¶ 142(a)) The facts on which Ms. Fairstein's observation were based – that "the victim had E-mail correspondence with the defendant before ever meeting him" and "[t]hey corresponded and met on the Internet" – were disclosed at the arraignment and therefore were public. (Exhibit U [Arraignment Transcript], at page 3, lines 6-7, 10) Information contained in a public record may be disclosed under the ethical rule, see DR 7-107(c)(2). We submit that Ms. Fairstein's statement – innocuous on its face – could not possibly have had a "substantial likelihood of materially prejudicing" the case.

Second, Ms. Fairstein's statement that the woman recalled Jovanovic "playing a violent movie about a killer doll or puppet" (assuming the statement was made, see Rule 56.1 Stmt., ¶ 142(b)) is factually accurate: J.R. did recall the movie and described it to Detective Bonilla, and Jovanovic has since admitted that he showed her the movie "Meet the Feebles," a violent muppets parody (see id., ¶¶ 45-47). In light of J.R.'s other allegations, which were publicly and appropriately disclosed at the arraignment (that he bound and gagged her, tortured her, talked

---

[3]        The remainder of the statement is not in quotes in the articles, and therefore cannot fairly be attributed to Ms. Fairstein. (See Exhibit Y [Answers to Interrogatories], at page 4 (the article adds, "an illustration of what can happen when people mistakenly assume that character can be judged by an exchange of e-mail messages")).

about dismemberment and the serial killer Jeffrey Dahmer), the statement about a violent puppet movie could not reasonably be viewed as likely to prejudice the proceedings.

Third, Ms. Fairstein's statement that when it was time for J.R. to go home, Jovanovic "alternated between threats and jokes" (*id.* ¶ 142(c)) (assuming this statement was made), likewise, cannot reasonably be viewed as likely to prejudice the proceedings. The statement fleshes out another detail about the case but not in a way that could have materially changed public perception given the information already disclosed.

Fourth, the statement in the New York Post that "[t]he candles allegedly used in the kinky torture had vanished by the time cops conducted their search," which Ms. Fairstein does not recall making (*see* Rule 56.1 Stmt., ¶ 142(d)), does not violate the ethical canons. At the arraignment, Ms. Fairstein disclosed what was reported to her, viz., that Jovanovic's mother "barricaded herself in [the] apartment and destroyed evidence that the police had seen there earlier." (Exhibit U, at 3:23-24) The criminal complaint, moreover, which was undisputedly public, recites that Jovanovic "burned [the complaining witness] with hot wax from a candle to her vaginal area," (Exhibit SS, at page two), and at the arraignment Ms. Fairstein, likewise, told the court that "[h]ot wax was poured on [the complaining witness'] body." (Exhibit U, at 3:15) Public disclosure had already been made that (1) Jovanovic's mother destroyed evidence, and (2) some of the evidence in the case included candles. The additional statement – assuming arguendo it was made, which Ms. Fairstein does not recall – could not reasonably be viewed as creating a substantial likelihood of material prejudice.

Fifth, the statements, "We believe that this is not the first time he [Jovanovic] did something like this," and "Because he was so prepared for this and carried it off so smoothly, we believe there are other victims," do not rise to a violation of the ethical canons. Within one week

of Ms. Fairstein's statement, three women – none of whom knew each other, but all of whom knew Jovanovic – corroborated her "belief" that there were likely other victims. (Rule 56.1 Stmt., ¶¶ 143-52)[4] In addition, the ethical canons expressly allow a prosecutor to "request assistance in obtaining evidence and information necessary thereto," and allow her to issue a "warning of danger concerning the behavior of the person involved," when there is reason to believe that there exists the likelihood of substantial harm to an individual or the public. DR 7-107(c)(5), (6). Ms. Fairstein's statement, fairly read, falls within these provisions.

Sixth, Ms. Fairstein's statements concerning discussions with executives at America Online and her encouraging anyone with information to come forward (Rule 56.1 Stmt., ¶¶ 142(g), (i)), are permitted by DR 7-107(c)(5), and not actionable. *See Powers*, 728 F.2d at 105.

Seventh, the statement, "He terrorized this young woman to the point that she was too frightened to call the authorities until weeks after it happened," which Ms. Fairstein denies making, would not be actionable either. The arraignment minutes reflect Ms. Fairstein's statements that the victim was "bound, . . . gagged, bitten. Objects were inserted in her vagina and anus. Hot wax was poured on her body. She was restrained by this defendant for almost twenty hours while she was tortured in a variety of ways." (Exhibit U, at 3:13-17) Jovanovic's attorney, Alan Kaufman, Esq., represented that "the allegations [against Jovanovic] deal with events that took place approximately two weeks ago" (*id.* at 7:5-6), so the purported delay in reporting the crime was also publicly, although inaccurately, stated. Even assuming that Ms. Fairstein said that Jovanovic "terrorized" J.R., the statement could not possibly have materially prejudiced the criminal case given the other facts already disclosed.

---

[4]     One of these women, "Tanya," told the New York Post about her harrowing experiences being stalked by Jovanovic (*see* Rule 56.1 Stmt., ¶¶ 146-49). Her public statements would be far more likely to cause harm to Jovanovic, given their specificity, than Ms. Fairstein's general statement about a "belief."

**B.**    **Jovanovic Cannot Show Proximate Cause**

We submit that Jovanovic cannot show that, "in fact," the statements set forth above

denied him a fair trial. *See Powers*, 728 F.2d at 105. The statements were made more than one

year before the trial began. None of the witnesses deposed in the case testified that news reports

influenced their testimony, and plaintiff's allegations that Mary Jo Chambers testified to "facts"

that appeared in a news story about the case (DE 40, ¶¶ 151-52) are likewise unsupported. As

*Powers* makes clear, in order to show injury "in fact," plaintiff must offer more evidence than the

extrajudicial statements coupled with an adverse jury verdict; rather, plaintiff must demonstrate a

causal connection between the conduct alleged to have violated his constitutional rights, and the

injury. *See Powers*, 728 F.2d at 105 (claim that plaintiff was denied a fair trial "requires more

than the mere speculation of damages"); *see generally Martinez v. California*, 444 U.S. 277, 285

(1980) ("Although a [section 1983] claim has been described as a species of tort liability, . . . it is

perfectly clear that not every injury in which a state official has played some part is actionable

under that statute") (citation and internal quotes omitted).

**C.**    **Jovanovic Cannot Show the Absence of Other Remedies**

In *Powers v. McGuigan*, 769 F.2d 72 (2d Cir. 1985) (hereafter "*Powers II*"), the court

granted summary judgment to the defendants on the grounds that plaintiff could not show that

traditional remedies to address pretrial publicity, such as the voir dire and/or a motion to change

venue, were unavailable or ineffective. *Powers II*, at 76. The court observed, among other

things, "(a) that Powers had pursued none of the traditional avenues for neutralizing the effects

of adverse pretrial publicity, such as moving for a change of venue, (b) that the responses of the

jurors during the voir dire suggested that the pretrial publicity would not interfere with their

ability to decide the case impartially and objectively, (c) that Powers ventured no challenges for

cause on the ground of juror exposure to publicity, [and] (d) that Powers left a substantial percentage of his peremptory challenges unused." *Id.* On similar grounds, we submit that summary judgment is appropriate here.

Because of the pretrial publicity (in part), precautions were taken to ensure a fair and impartial jury, including distribution of a detailed juror questionnaire, lengthy voir dire (three full days), and repeated instructions by the trial judge, Hon. William A. Wetzel, to the jurors on the issue of media exposure. The juror questionnaire asked each juror which newspapers or magazines he read, whether he had heard anything about Plaintiff's case in the media or in conversation, and if the juror answered "yes," what specifically he or she had heard. (Exhibit LL [Sample Questionnaire], at 6, 9-10) Judge Wetzel admonished the prospective jurors to provide truthful answers and explained that the extensive media attention necessitated detailed questioning. (Appendix 1 [3/10/98], at 156-57, 161). The voir dire shows that the questionnaire weeded out those few jurors who actually had heard anything about the case. (Appendices 1-3, *passim*)

Judge Wetzel also discussed publicity with the prospective jurors on multiple occasions during the voir dire process. Prior to preliminary screening, he explained the goal was to select "jurors who . . . will ignore the possibility that exists in this case of media coverage and will set aside any biases or prejudices of any sort." (Appendix 1 [3/10/98], at 155). Before each occasion that the attorneys addressed the prospective jurors in groups of sixteen, Judge Wetzel discussed the potential impact of publicity on the jurors' ability to resolve the case in an impartial manner. (Appendix 1 [3/10/98], at 247-48) ("The pivotal question we're going to try to explore now, is as you sit here today are [sic] of the mind that can be fair and impartial and even if you did learn something about the case through the media, that you can assure us that you

- 17 -

would put that aside and you would start with a plain, clean slate and you would confine yourselves strictly to the evidence and bring no other matters into your consideration in resolving this case"); (Appendix 2 [3/11/98], at 353-54, 457-58); Appendix 3 [3/12/98], at 24). Finally, Judge Wetzel admonished all selected and alternate jurors to avoid exposure to media coverage of the case. (Appendix 2 [3/11/98], at 349) ("In the meantime, I remind you even more so because you're sworn jurors...to avoid reading anything that may be printed about this case in any newspapers"); *id.* at 452; Appendix 3 [3/12/98], at 20, 139).

During voir dire, defense attorney Jack Litman had the opportunity to strike jurors he believed were biased as a result of pretrial publicity. Mr. Litman successfully challenged one juror for cause on the ground that she had read about the case in the newspaper, associated the story with a personal experience, and expressed a resulting inability to be impartial. (Appendix 1 [3/10/98], at 204-14, 225, 241; Appendix 2 [3/11/98], at 336-38). Mr. Litman also exercised a peremptory challenge to strike a juror who had read an article about the Robert Chambers trial that Mr. Litman believed portrayed him in a negative light and thereby could prejudice his client. (Appendix 1 [3/10/98], at 308-10; Appendix 2 [3/11/98], at 334-35) Mr. Litman consented to eleven of the twelve jurors eventually seated. (*See* Appendix 2, at 347-48 (approving first three jurors); *id.* at 451 (approving next six jurors); Appendix 3, at 19 (approving next two jurors)). One juror was seated over a defense objection, but the objection concerned *Batson* criteria, not exposure to pretrial publicity. (Appendix 3, at 113) Moreover, when an alternate was seated during the trial, defense counsel consented to the substitution. (Rule 56.1 Stmt., ¶ 190)

Under these circumstances, summary judgment is warranted here, as in *Powers II.* The undisputed record shows that (1) Jovanovic never moved for a change of venue of the trial, (2) his counsel exercised challenges to jurors believed to be biased, or potentially biased, due to

media coverage, and (3) defense counsel consented to the panel subject to one objection, which was unrelated to pretrial publicity. All of the evidence shows that the voir dire process successfully resulted in an impartial panel, unbiased because of media coverage. *See Powers II*, at 76. Plaintiff cannot show that the traditional remedies were therefore ineffective.

### D.     Ms. Fairstein is Entitled to Qualified Immunity

Governmental officials are entitled to qualified immunity whenever their performance of discretionary functions "does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1992). The defendant is <u>also</u> entitled to qualified immunity where reasonably competent officials could disagree as to whether the conduct at issue would violate clearly established rights. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). At worst, as shown above, reasonable officials might disagree as to whether Ms. Fairstein's extrajudicial statements – assuming that each statement was actually made by her – violated the governing ethical canons (*see* Point V-A, above). For this reason, she is entitled to qualified immunity.

We submit that the court's decision denying defendants' motion to dismiss is not binding on the issue of qualified immunity, at this time. In that decision, the court accepted as true plaintiff's allegations that Ms. Fairstein "made statements to the press outside of the arraignment or trial proceedings," and further noted that "[p]laintiff provides quotes." (DE 39, at 28 n.5) These allegations were sufficient to withstand defendants' Rule 12(c) motion. (*Id.*) Discovery, however, reveals that at least some of the quotes paraphrase what Ms. Fairstein said at the arraignment, which is not actionable. (*Compare* Rule 56.1 Stmt., ¶ 142 *with* DE 40, ¶ 79)

# VI.   Seventh Claim – Municipal Liability[5]

Plaintiff alleges municipal liability in three areas: (1) deliberate indifference by the DA's Office with regard to a "custom or practice" of systematic leaks intended to prejudice the accused in high profile criminal cases (DE 40, ¶¶ 170-78); (2) deliberate indifference by the City to the police department's alleged custom and practice of systematic leaks, also allegedly intended to prejudice the accused in high profile cases (*id.*, ¶¶ 179-87), and (3) deliberate indifference by the DA's Office with regard to a custom or practice of purported "prosecutorial actions" that allegedly violate suspects' constitutional rights, and it is further alleged that "an analysis of convictions . . . which have been reversed, modified or vacated" based on the purported "actions" reflects the pattern. (*Id.*, ¶¶ 188-95) None of these claims are viable.

## A.   Deliberate Indifference – Systematic "Leaks" – DA's Office

"A section 1983 action may be maintained based on a practice that was so persistent or widespread as to constitute a custom or usage with the force of law." *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citations and internal quotes omitted). "The alleged custom or practice need not be embodied in a rule or regulation, [but] must be so manifest as to imply the constructive acquiescence of senior policy-making officials." *Id.* (citations and internal quotes omitted). "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city policy or custom that is actionable under § 1983." *Amnesty America*, 361 F.3d at 126 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Significantly, "evidence of one instance" in which municipal employees violated a citizen's rights is not enough to raise a jury question as to whether the

---

[5]   Plaintiff's Sixth Claim asserted against ADA Heatherly has been dismissed. (DE 11)

conduct "constitute[s] a practice so manifest as to imply the constructive acquiescence of senior policy-making officials." *Green*, 465 F.3d at 81 (citation and internal quotes omitted).

We submit that plaintiff cannot meet the stringent test required to establish the District Attorney's deliberate indifference to alleged "leaks" in high profile cases. In his answers to interrogatories, plaintiff cannot point to specific statements attributed to assistant district attorneys in any case other than his own. (Exhibit Y, at pp. 11-19) It is well-settled that "evidence of one instance" cannot satisfy the requirement of a municipal "custom or practice." *See Green*, 465 F.3d at 81.

Apart from the foregoing, the procedure in place at the District Attorney's office during 1996 is that all interview requests were to be approved either by the chief assistant or by himself. (Rule 56.1 Stmt., ¶ 191) The policy does not, as a matter of law, exhibit deliberate indifference. *Cf. Amnesty America*, 361 F.3d at 126.

Finally, since plaintiff cannot establish an underlying violation of his right to a fair trial in this case, *see* Point V, supra, his *Monell* claim against the City or the District Attorney should be dismissed. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

**B.**     **Deliberate Indifference – Systematic "Leaks" – NYPD**

Plaintiff does not allege in the Amended Complaint that any NYPD officer leaked information to the press (*see* DE 40). In the absence of a cause of action alleging an underlying violation, plaintiff's Monell claim must be dismissed as a matter of law. *See Heller*, 475 U.S. at 799. Even if plaintiff had pleaded an underlying violation, no evidence in the record exists on which a reasonable juror could conclude that (i) an identified NYPD officer leaked information to the press, or (ii) there is an unofficial custom within the NYPD allowing its officers to engage in such leaks. Summary judgment is therefore appropriate. *See Jeffreys*, 275 F. Supp. 2d at 476

(in order to defeat summary judgment, moving party must adduce "some affirmative evidence" that supports his claims) (citation omitted).

## C.    Deliberate Indifference – DA's Office – "Failure to Train"

Plaintiff cannot establish a Monell claim against the City based on the District Attorney's alleged failure to train his assistants in various areas, which plaintiff alleges are, among others, (i) the obligation to discontinue a prosecution when evidence is discovered which negates probable cause, (ii) a prosecutor's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, (iii) the duty not to threaten or intimidate defense witnesses, or tell them not to speak to defense investigators, (iv) the duty not to pressure witnesses to give false testimony, and (v) duties with regard to fair comment on the evidence in summation. (DE 40, ¶ 188) As shown below, the claim is not viable because: (1) plaintiff cannot establish an underlying violation, (2) any injury caused by any purported violation was the subject of rulings by the trial judge, which constitute an intervening cause as a matter of law, (3) there is no evidence of any custom or practice, and (4) plaintiff's claims are barred by the U.S. Supreme Court's decision in *Van de Kamp v. Goldstein*, --- U.S. ---, 129 S. Ct. 855 (2009).

### 1.    Plaintiff Cannot Show any Violation of his Rights Due to Conduct by the Prosecutors

The constitution "entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986); *see also United States v. Hasting*, 461 U.S. 499, 508 (1983) ("there can be no such thing as an error-free, perfect trial"). Here, Jovanovic appealed his conviction on a number of different grounds, including most if not all of the alleged "misconduct" about which he now sues. (*See* Appendix Four, at 51-54, 84-112) The Appellate Division found error only in the trial court's application of the Rape Shield Law to exclude certain evidence. No finding of misconduct whatsoever was made. We submit that the

Appellate Division decision is powerful evidence that the prosecution committed no misconduct whatsoever in this case.

In this connection, plaintiff's allegations that prosecutors told witnesses not to speak to defense investigators, or otherwise shaped their testimony, is baseless. None of the witnesses stated that a prosecutor told him or her what to say on the stand, or told him/her that he should not speak to the defense. (Rule 56.1 Stmt., ¶¶ 169-75) The absence of any evidence to support these allegations warrants dismissal. *Celotex*, 477 U.S. at 322-23; *Gallo*, 22 F.3d at 1223-24.

### 2. The Trial Court's Rulings are a Superseding Cause of any Purported "Harm" to Jovanovic

Jovanovic alleges that the prosecutors committed numerous violations of his rights, including by "suborning perjury" (i.e., allowing J.R. to testify falsely about her electronic communications with Jovanovic), by making ad hominem attacks in summation, and by opposing Jovanovic's attempt to introduce overlapping, cumulative expert testimony. Most if not all of these issues were raised before the trial court, and Judge Wetzel agreed with the People on each one of them, overruling the defense objections in certain cases and sustaining the People's objections in others. (*See, e.g.,* Appendix Four, at 51-54, 84-112) Even if this court were to conclude that harm resulted from positions taken by the prosecutor, or from remarks made by the prosecutor in summation, Judge Wetzel's decisions are an intervening, superseding cause of that harm. *E.g., Wray v. City of New York*, 490 F.3d 189, 193-94 (2d Cir. 2007) (trial judge was "an intervening decision maker" who was not misled or coerced).

### 3. Plaintiff Cannot Show Any "Custom or Practice"

The New York County DA's office obtained tens of thousands of convictions during the 1990's (*see, e.g.,* Rule 56.1 Stmt, ¶¶ 186-87), and plaintiff alleges that approximately fifteen (15) of those convictions were reversed on the purported grounds of prosecutorial misconduct.

Accepting arguendo that plaintiff is correct as to the number of reversals due to "misconduct," which is doubtful,[6] the evidence of "misconduct" is hardly "so persistent or widespread as to constitute a custom or usage with the force of law." *Green*, 465 F.3d at 80.[7]

Moreover, in order to establish municipal liability, plaintiff must satisfy "rigorous standards of culpability and causation." *See Board of County Commissioners v. Brown*, 520 U.S. 397, 406 (1997). In order to hold a municipality liable as a "person" within the meaning of section 1983, plaintiff must establish that the municipality itself was somehow at fault through evidence of a municipal policy or custom that caused that alleged violation. *Oklahoma City v. Tuttle*, 471 U.S. 808, 818-19 (1985); *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978) (plaintiff must establish that municipal policy or practice was the "moving force [behind] the constitutional violation"). We submit that plaintiff cannot show any "link" between a specific "practice" (such as suborning perjury, or making inappropriate comments during summation) and the injury he alleges here. *See Brown*, 520 U.S. at 404-405.

### 4. Plaintiff's Claims are Barred by *Van de Kamp v. Goldstein*

Plaintiff's *Monell* claims against the District Attorney are based on the Second Circuit's decision in *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), but the reasoning of *Walker* has been fatally undermined by the Supreme Court's decision in *Van de Kamp v. Goldstein*, --- U.S. ---, 129 S. Ct. 855 (2009). *Walker* allows *Monell* claims against elected district attorneys based on failure to train or supervise, on the grounds that the decisions made by district attorneys

---

[6]    Three of the cases involved no finding of misconduct or else involved harmless error, *see People v. Tonge*, 253 A.D.2d 360 (1st Dept. 1998); *People v. D'Alessandro*, 184 A.D.2d 114 (1st Dept. 1992); *People v. Jones*, 181 A.D.2d 463 (1st Dept. 1992). Others involve disagreement among the courts, or within the appellate panels, as to whether the conduct at issue was improper, *see, e.g., People v. Davis*, 81 N.Y.2d 281, 286-87 (1993); *People v. Thompson*, 161 A.D.2d 236 (1st Dept. 1990). Even where the courts found some evidence of misconduct, we submit that the errors were not egregious or substantial. *E.g., People v. Ellis*, 171 A.D.2d 619 (1st Dept. 1991) (warning prosecutor not to make comments in summation likening defense counsel's tactics to "McCarthyism").

[7]    Only one reversal was deemed worthy of review by the First Department disciplinary committee, and the committee found no ethical violation. (Exhibit UU)

concerning training and supervision are administrative in nature, and do not involve the prosecutorial function. *Walker*, 974 F.2d at 301 (noting that plaintiff challenged "the district attorney's management of the office – in particular the decision not to supervise or train" assistants). For this reason, under *Walker*, district attorneys act on behalf of the counties that elected them, rather than the State, when they implement a training program. *Id.* (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 481-85 (1986)). In concluding that district attorneys were county policymakers with regard to training, rather than agents of the State, *Walker* distinguished an earlier decision, *Baez v. Hennessy*, 853 F.2d 73 (2d Cir. 1988), *cert. denied*, 488 U.S. 1014 (1989), which had held that for purposes of Section 1983 liability, "when prosecuting a criminal matter, a district attorney in New York State, . . . represents the State, not the county," and is therefore not a municipal or county policymaker. *Walker*, 974 F.2d at 301 (quoting *Baez*, 853 F.2d at 77).

Van de Kamp, however, clearly holds that supervision and training with regard to the "trial-related" functions of prosecutors – including *Brady* issues – is a "prosecutorial" function, not an administrative one, such that all members of a district attorney's office enjoy absolute immunity from suits under Section 1983 for failure to train or supervise trial assistants. *Van de Kamp*, 129 S. Ct. at 863 (citing *Imbler v. Pachtman*, 424 U.S. 409, 425-26 (1976)). *Van de Kamp*, therefore, abolishes the distinction on which *Walker* is based: Under *Van de Kamp*, training and supervision is a prosecutorial function, and under *Baez*, in this circuit, district attorneys who perform prosecutorial functions represent the State, not the county. *See Van de Kamp*, 129 S. Ct. at 863; *Baez*, 853 F.2d at 77. For these additional reasons, plaintiff's *Monell* claims against the District Attorney's Office should be dismissed.

## **Conclusion**

For the foregoing reasons, defendants' motion for summary judgment should be granted in its entirety.

Dated:      New York, New York
               December 7, 2009

                             Respectfully submitted,

                             MICHAEL A. CARDOZO
                             Corporation Counsel of the City of New York
                             *Attorney for Defendants*
                             100 Church Street
                             New York, New York 10007
                             (212) 788-1599

By:                                                 
                             Arthur G. Larkin (AL 9059)