Defense Opening                                94

cute".

Then later on near the end of a long discussion they have near the end of it she writes "May I proposition you for cafe latte to -- If I proposition you for cafe Latte, will you object?

When she says what is your name, he says Oliver. In that same conversation she says "Oh, Oliver, my most beloved name ever".

She goes on to talk about how it appears to be the name of her favorite dog and she is enthralled with this person she has been talking to has the name Oliver.

Ladies and gentlemen, no one is blaming ████████ ████ for going back to Oliver's apartment near midnight on Friday night the 22nd into early Saturday the 23rd. She wanted to do so. She asked to do so. Certainly there is nothing wrong with that.

No one is blaming her for her expressed desire to him to engage in an S and M experience with Oliver that night. Or no one is blaming him for wanting to do it with her that night.

They were consenting adults and as we

rAj

1
2 describing this incident.

3          The evidence will show that ▮▮▮▮ ▮▮▮▮

4 was scared and repulsed by what was inside of

5 herself, repulsed by her own desires that she

6 willing engaged in and experience, call it S and

7 M or bondage and domination which was

8 nonviolent, which was consentual, but still very

9 disturbing to her, but which was transformed by

10 her own expressed psychological makeup as she

11 expressed it to Oliver Jovanovic.

12          It was transformed into an angry violent

13 assault.  You will see that when she engaged in

14 what she writes about to Oliver that she wants

15 to do that night and what she talks to Oliver

16 about what she wants to do that night, that part

17 of her, she is obsessed with that and at the

18 same time unbeknownst to her she has a self

19 anger and a self-loathing about this.

20          In order to absolve herself of any

21 accomplicity or responsibility for what she

22 undertook, she begins over time, that is why it

23 took several days blaming Oliver Jovanovic and

24 completely absolving herself.

25          She didn't want to do this.  Now she says

rAj

```
 1                      ▮▮▮▮ - People - Direct            259

 2        A.   No.

 3        Q.   What happened then?

 4        A.   He told me again.

 5        Q.   Then what happened?

 6        A.   He reached for my breast.

 7        Q.   What did he do?

 8        A.   I couldn't take that anymore.  It hurt so much.

 9             THE COURT:  Wait for the next question.

10        Q.   What did the defendant do with the baton then?

11        A.   He said if you don't want that, I'm going to hit

12  you.

13        Q.   Did he hit you with the baton?

14        A.   Yes.

15        Q.   Where?

16        A.   My thighs.

17        Q.   Where specifically on your thighs?

18        A.   The inside.

19        Q.   How close was it to your genital area?

20        A.   He hit me there.

21        Q.   Can you describe how he hit you with the baton.

22        A.   He didn't hit me like it was a club.  He didn't

23  lift it over his heed and bash it down.

24        Q.   How did he hit you?

25        A.   He used his wrist, like someone would snap a
```

rAj

1                          ▮▮▮ - People - Direct              260

2   whip.

3        Q.   How many times did the defendant hit you between

4   the thighs?

5        A.   Lots.

6        Q.   Did there come a time that the defendant moved

7   your position on the bed?

8        A.   Yes.

9        Q.   And what did he do?

10       A.   I was on my stomach.

11       Q.   While you were on your stomach, were your ankles

12   and arms still tied together?

13       A.   Yes.

14            THE COURT:   How were they tied?

15            THE WITNESS:   My wrists were tied together

16            and my ankles were tied together.  Those were

17            tied together.

18       Q.   Was it behind your back?

19       A.   Behind my back.

20            THE COURT:   I'm not sure I understood.

21            Your wrists were tied and your ankles were tied,

22            then your ankles were tied to your wrists?

23            THE WITNESS:   Yes, behind my back.  My

24            knees were bent.

25            THE COURT:   Thank you.

rAj

```
1                    ███████  - People - Direct              261

2                   Next question.

3       Q.   While you were lying on your stomach, what did

4   the defendant do?

5                   THE COURT:  Tell us what happened next?

6       A.   He put his hand on my left breast and he put his

7   body on top of mine and he whispered in my right ear, what

8   do you want me to do to you.  I said untie me, let me go.

9       Q.   Miss ███████  after you said that -- Was his body

10  touching yours?

11      A.   Yes.

12      Q.   Had the defendant removed any of his clothing up

13  to this point?

14      A.   No.

15      Q.   Could you feel his genital area against you

16  while he was lying on you?

17      A.   Yes.

18                  MR. LITMAN:  Objection, leading, Your

19              Honor.

20                  THE COURT:  Overruled.

21      Q.   What do you feel?

22      A.   His penis.

23      Q.   Can you describe what condition it was in?

24      A.   Erect.

25      Q.   And after you said, let me go, what did the
```

rAj

1                         ███████ - People - Direct                262

2    defendant say?

3          A.    I don't remember his exact words.

4          Q.    What did he do then with the baton?

5          A.    I remember feeling him before that.  He was

6    touching my genitals.

7          Q.    With what?

8          A.    With his fingers.

9          Q.    What part of your genitals?

10         A.    Outside of my genitals.

11         Q.    Did he touch your anus?

12         A.    No.

13         Q.    What did he do next?

14         A.    He took the baton or something hard, it could

15   have been his penis, I don't know what it was.

16         Q.    What did he do?

17         A.    Something was inserted into my anus.

18         Q.    Did that hurt?

19         A.    Yes.

20         Q.    While he was inserting the baton or his penis

21   inside your anus, what did he do with his finger?

22         A.    He put it in my vagina.

23         Q.    Can you tell the jurors how he put his finger

24   inside your vagina?

25         A.    Repeat the question.

1            █████ - People - Direct       268

2 to untie some of your ties?

3      A.    He was trying to look at my genitals.

4      Q.    What happened next?

5      A.    I ran for my pants and I put them on and he got

6 up and he chased me to the futon and he tried to get me

7 down and he pushed me down to the futon and I started

8 wrestling. He was trying to get me. He was trying to

9 hold my arms down. He was trying to grab me with his

10 thighs and I just fighting. I just kept fighting. I

11 wasn't going to let him get any part of my body down. I

12 kept moving and moving and I just wouldn't let him get an

13 arm down, wouldn't get him get a leg down. I ran wherever

14 I would have the chance, I would run from the bed to the

15 futon.

16                THE COURT:  Miss █████ the reporter has

17                to take it down.

18      Q.    What did the defendant do when you were trying

19 to fight him off?

20      A.    He tried to get me tied backup.

21      Q.    Did there come a time when you were able to pull

22 your pants on?

23                MR. LITMAN:  Objection.  She said she did

24                before, Your Honor.

25                THE COURT:  Overruled.

1                              ████  - People - Direct          269

2           A.    Yes.

3           Q.    Were you in your underwear at that point?

4           A.    No.

5           Q.    Were you able to get any of your other clothes

6    on?

7           A.    Yes.

8           Q.    What?

9           A.    I grabbed my sweater.  As I was running I put my

10   sweater on.

11          Q.    And what about the rest of your clothes, your

12   panties and bra, what did you do with those?

13          A.    My bra was by the futon.  I picked it up.  When

14   I was by the bed I picked up my panties.

15          Q.    What did you do with them?

16          A.    I clenched them in my hands.

17          Q.    Where did you put them?

18          A.    I just clenched them.  I put the panties in my

19   pocket of my pants.

20          Q.    Did there come a time that you got to the door

21   of the defendant's apartment?

22          A.    (Nodding)

23          Q.    What did the defendant do?

24                MR. LITMAN:  Your Honor, she didn't say,

25                let the record reflect she was shaking her head

rAj

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

█████ - People - Direct                495

MS. HEATHERLY:  This is an issue we need to

raise here.  Mr. Litman referred in his opening

to two statements from legal arguments made by

the People.  One of them was "bled profusely"

and the other one was "Rammed violently".  Those

are taken from legal briefs by the prosecution.

THE COURT:  Miss Heatherly I can't control

people's opening statements as Mr. Litman aptly

put it, that is a promissory note.  He issued

his promissory note.  We have to see where it

goes.

MS. HEATHERLY:  I want to to give your

Honor law if he is arguing it is an admission.

Those were affirmations on information and

belief.

THE COURT:  He is not.

MS. HEATHERLY:  If he is arguing it is a

prior inconsistent statement, he is precluded

from confronting her.

THE COURT:  I'm confident he won't argue

that.

MR. SOSINSKY:  Then we better talk about it

now.  We are confident we are going to do that,

Judge.  We have a prosecutor under oath stating

rAj

```
 1                     ███████  - People - Direct              496
 2     that this is what occurred.
 3                THE COURT:  And you are going to a --
 4                MR. LITMAN:  I have more than a good faith
 5     basis in asking the complaining witness did you
 6     tell either someone in law enforcement or Gail
 7     Heatherly what is written here and I will show
 8     it to her.
 9                THE COURT:  All right.  Hold it.  That is a
10     different question.
11                MS. HEATHERLY:  She'll say no.
12                THE COURT:  That is okay.  He can ask that
13     question.
14                MS. HEATHERLY:  He has to lay the
15     foundation.
16                THE COURT:  He lays the foundation that is
17     similar to what if you ask if you've got, let's
18     say, a DD-5 and you are going to say well did
19     you tell police officers so and so the guy was
20     wearing a red death.
21                MS. HEATHERLY:  It is a little different.
22     It is an affirmation.  I have law on that.  The
23     case is out of the Court of Appeals.
24                THE COURT:  No, he cannot put into
25     evidence, he cannot use the document in
```

rAj

1                    Cross - ███ - Litman

2       Q    Would you turn to I-M if you would and look at

3   page 3.  This is the message between you and Oliver, near

4   the end of June of 1996, is that right?

5       A    This is the conversation in June, 1996.

6       Q    Is that right?

7       A    Yes.

8       Q    And remember Oliver telling you about a prank

9   that he had read about involving Penn an Teller, do you

10  remember that?

11      A    Yes, I don't know if he read about it, though.

12  He --

13      Q    I'm sorry?

14      A    I don't know if he read about it, he didn't tell

15  me how he found out about it.

16      Q    But he told you about it?

17      A    Yes.

18      Q    And he told you, at the end, about how the people

19  who put together this prank did it not with precision, in

20  fact, the words he used were, it looked very rough, remember

21  him writing that to you on line 28?

22      A    28?  Yes.

23      Q    And your comment to him was, "rough is good"?

24      A    Yes.

25      Q    What did you mean by rough is good?

1                    Cross -           - Litman

2        Q      Did you say to him in the next E-mail, no I'm not

3   you're wrong?

4        A      I didn't mention it.

5        Q      So, you did not say that, is that correct?

6        A      That's correct.

7        Q      And did he write to you, "as for more interesting

8   than sex, suggest you look into tantric yoga, kundalini yoga

9   alchemy and sex magick.  I suspect those are ideas you

10  haven't explored.  Might give you a different perspective.

11  Oliver"?

12       A      He said "areas" instead of "idea" but that's what

13  he wrote.

14       Q      "Areas" instead of "idea"?

15       A      Right.

16       Q      And if you turn to the next page, you answered

17  that, did you not?

18       A      I did.

19       Q      And you wrote, "I read a bondage and dominence

20  book that had a few pages about sex magic, I could see

21  flirting with that for a while", did you write that?

22       A      That's what I wrote.

23       Q      Excuse me?

24       A      Yes, that's what I wrote.

25       Q      Did you read a bondage and dominence book?

```
 1                    Cross -        - Litman

 2          A     That's what I say.

 3          Q     And that conveys, does it not, Miss        that

 4     after you've tested yourself, that you're going to continue

 5     to do it, doesn't that convey that?

 6          A     It doesn't convey it to me.  I was trying to say

 7     it to him, that if like you make dismemberment a joke and

 8     then you do it then the next step is murder, that's what I

 9     was trying to say to him.

10          Q     But you weren't really thinking about

11     dismemberment, were you?

12          A     Yes.

13          Q     You really thought that Oliver was thinking about

14     for example taking a saw and cutting your leg off?

15          A     That's what I was thinking -- well, that's the

16     joke, that's what I thought he was saying in his joke.

17          Q     You thought he was saying that maybe he wanted to

18     get together with you to cut off one of your arms?

19          A     He was jokingly saying that but maybe, I mean --

20     maybe he did want to do that.

21          Q     Miss        weren't all of these words code

22     words that were going on between you and Oliver, isn't that

23     what was really going on between you and Oliver?

24                     MS. HEATHERLY:  Objection.

25                     THE COURT:  Overruled.
```

```
 1                    Cross -        - Litman

 2       A    No.

 3       Q    So you're telling us that when this word

 4  "dismemberment" was used here, you actually thought of it in

 5  the literal sense of the word, correct?

 6       A    That's correct.

 7       Q    And after you thought that Oliver was actually

 8  thinking about dismembering you, you went out on a date with

 9  him, is that right?

10       A    He said it was a joke, so I did.

11       Q    Excuse me.

12            Did you go out on a date with him?

13       A    Yes, I did.

14       Q    Willingly?

15       A    Yes.

16       Q    And then you went back to his apartment at about

17  midnight?

18       A    11:30, yes.

19       Q    And when you were tied up, you didn't protest at

20  the moment you were tied up, is that correct?

21       A    That's correct.

22       Q    And this is a man with whom you say you

23  thought --

24                 MR. LITMAN:  Withdrawn.

25       Q    What is the date of this E-mail, by the way, that
```

1              Cross - ███ - Litman

2    you wrote?

3         A      November 20th.

4         Q      At what time of day?

5         A      (no response)

6         Q      20 I guess means eight o'clock at night, right so

7    it would be 8:48 in the evening, is that correct?

8         A      Right.

9         Q      That's just forty-eight hours before you went out

10   on a date with Oliver Jovanovic and a few hours after that,

11   you went back to his apartment, is that right?

12        A      If those times are correct, yes.

13        Q      I ask you again, isn't dismemberment that you are

14   referring to, here, nothing to do with it's literal meaning

15   but in fact, it's a code word?

16              MS. HEATHERLY:  Objection.

17              THE COURT:  I'm going to allow it one more

18         time.

19        A      I thought it meant dismemberment in the sense

20   where you take a saw and cut someone's leg off.

21        Q      And when you wrote near the end of this, on lines

22   44 and 45, "If dismemberment really riles you up, you may be

23   in my snuff film and wish for bad pleasure #1 at

24   Christmastime", did you write that?

25        A      That's not the end of it, it goes kind of

Angela Bonello, Sr. Court Reporter

```
 1                    Cross -  ████  - Litman
 2      together.
 3          Q     You write, it goes in fact a few more lines, so
 4      forgive me and let's rephrase the question.
 5                On lines 44 and 45, did you write, "If
 6      dismemberment really riles you up, you may be in my snuff
 7      film and wish for bad pleasure # 1 at Christmastime", did
 8      you write that?
 9          A     Yes, I wrote that.
10
11          (Transcript continues on followng page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    ███████ - People - Cross          843

2        Q.   What was "bad pleasure number one at Christmas

3   time"?

4        A.   Dismemberment.

5        Q.   Where did that phrase come from "bad pleasure

6   number one"?

7        A.   I made it up when I was writing.

8        Q.   When you wrote that to him, I ask you again was

9   that not part of code words that were going on?

10              THE COURT:  Sustained.

11       Q.   This line --

12              MR. LITMAN:  This line, your Honor?

13              THE COURT:  All right.  This line is that

14          line part of a code word?

15              THE WITNESS:  It is not part of a code

16          words.

17       Q.   It is not part oa a code word?

18       A.   No.

19              THE COURT:  Don't repeat.

20              MR. LITMAN:  I couldn't hear.

21              THE COURT:  Ask the reporter to read it

22          back rather than repeating it to the jury, Mr.

23          Litman.

24       Q.   When you wrote about dismemberment a little

25   higher up on that page 38 to 39, that "it could get sick

rAj

```
1                          ████   - People - Cross          844

2    and just may", do you remember writing that?

3         A.    Where is that?

4         Q.    Line 38 and 39?

5         A.    38 and 39, I wrote that.

6         Q.    Still on page 43?

7         A.    Yes.

8         Q.    When you wrote that "it could get sick and just

9    may get sick", you meant to imply by that it might, in

10   fact, get sick; is that right?

11        A.    If he was talking about literal dismemberment,

12   he could go onto commit murder, that is what I meant.

13        Q.    You certainly didn't want to be dismembered?

14        A.    No.

15        Q.    That is why you were writing to him this literal

16   stuff about dismemberment, correct?

17        A.    I wrote it because I was confused.  I mean I

18   thought it was a joke and I just wanted to point out that

19   this is a joke.

20        Q.    Look at the next page please, "So what taboo

21   question should I ask".

22              Did you write that?

23        A.    Yes.

24        Q.    What taboo question were you thinking about when

25   you wrote that; do you know?
```

rAj

```
 1                         ███     - People - Cross        845

 2        A.    I didn't have one in mind.

 3        Q.    Isn't that another code word for either bondage

 4   and domination or S and M?

 5        A.    Which word?

 6        Q.    "What taboo question should I ask"?

 7        A.    Is "taboo question a code word"?

 8        Q.    No.

 9        A.    Taboo question means taboo question.

10        Q.    What taboo question were you referring to?

11        A.    I didn't have a reference question.

12        Q.    Next question then, "hmm how would you like to

13   die", is that what you wrote to him?

14        A.    Yes.

15        Q.    You wrote this after telling him in your words

16   that you were reprimanding him for thinking about

17   dismemberment, correct?

18        A.    Correct.

19        Q.    Then you wrote to him "hmm how would you like to

20   die"?

21        A.    That's correct.

22        Q.    Why did you write to him "hmm how would you like

23   to die", did you think that was exciting?

24        A.    No.  I thought he was different and --

25        Q.    In what way was he different for you to write
```

1          ███████ - People - Cross                    849

2   is tricky, so I thought maybe.

3          Q.   And "speaker", who is the speaker that you were

4   referring to on line 38?

5          A.   It is his riddle as "I" I can vivify rose gray

6   sir.  So "I" is like in a position where he has to call

7   someone sir, that is the speaker.

8          Q.   And you wrote "in submissive position of

9   authority"?

10         A.   Correct, like in the military.

11         Q.   What did you mean by submissive there "in

12  submissive position of authority"?

13         A.   Like the difference between a private and a

14  general.  This person here says, "I singlehanded vivify

15  rose gray sir" so I thought maybe he was in the Army or

16  perhaps like on a ship in the Navy.

17         Q.   That person would be submissive in the position

18  of authority?

19         A.   Correct.

20         Q.   That's not another code word?

21         A.   That is not a code word.

22         Q.   Look at the next page.  You didn't get a

23  response to that particular e-mail; is that correct?

24         A.   This is part of it I sent.

25         Q.   You sent it twice; is that correct?

rAj

1           █████ - People - Cross        850

2     A.   Yes. I sent it twice. I don't think I meant to

3 send the first one, because I was still working on it.

4     Q.   But you sent it nonetheless?

5     A.   Accidentally, yes.

6     Q.   And then the second one you continued, did you

7 not, on page 48 near the top.

8     A.   Yes.

9     Q.   You wrote to Oliver on line 6 or 7, "so my

10 answer you want to be Christ's counterpart crucified

11 martyr "?

12     A.   Right.

13     Q.   Wrote on line 15 "Hmm I'm questioning which of

14 your many quote unquote hobbies to muck around in"?

15     A.   Correct.

16     Q.   Those hobbies have to do with S and M?

17     A.   No.

18     Q.   Excuse me?

19     A.   I think I list them. I list the hobbies at the

20 end of it, at the end of the e-mail.

21     Q.   Do they have to do with S and M?

22     A.   No.

23     Q.   Do they have to do with bondage and domination?

24     A.   No. I put it in a quote.

25     Q.   Excuse me?

2      A.    Hobbies I think, I'm remembering, I put hobbies

3   in a quote because his hobbies were his work.  His work

4   was making board games, which he called a hobby but

5   hobbies and work went together.

6      Q.    That is not what you meant at all by hobbies;

7   isn't that correct you didn't mean that did you?

8      A.    Yes, that's what I meant.

9      Q.    On the next line you write, the very next line

10  "You see I'm not sexual.  My idea of a good time is dirt.

11  Dirt I find quite erotic"?

12     A.    Yes.

13     Q.    That's the very next thing that you wrote?

14     A.    That's correct.

15     Q.    Is your idea of good time dirt?

16     A.    Dirt, clay, rock.

17     Q.    Raw?

18     A.    Rock as in to sculp.

19     Q.    You are not sexual but your idea of good time is

20  like a rock to sculp, is that what you meant by that line?

21     A.    Dirt, clay, making sculpture.

22     Q.    And why is that in the same sentence with "You

23  see I'm not sexual"?

24     A.    Because you can take that energy and put it into

25  your work which hobbies meant work for Oliver.

rAj

2        My work I was thinking of being a sculptor at

3   one point sculpting and I'm a philosophy major, which is

4   also work.  Those are my hobbies.

5        Q.   You are telling us that is what you meant by

6   when you wrote "I'm not sexual, my idea of good time is

7   dirt"?

8        A.   That's correct.

9        Q.   You find dirt quite erotic?

10       A.   Well making sculptures, clay, yes.

11       Q.   That's what dirt means?

12       A.   Dirt, clay.

13       Q.   That sculpting is irotic and use the word dirt

14   for sculpting?

15       A.   That's correct.

16       Q.   And you asked "if you want to direct me to more

17   interesting waters captain Vire, I solute the effort"?

18       A.   Correct.

19       Q.   Is that a code word about your desire to have

20   the bondage and domination experience or scene with Oliver

21   when you were going meet with him?

22       A.   No.

23       Q.   Was that a code word you used to have an S and M

24   experience or scene with Oliver when you were going meet

25   with him?

rAj

```
 1                          - People - Cross           853

 2         A.    No.

 3         Q.    Captain Vire is the captain from Billy Budd?

 4         A.    That's correct.

 5         Q.    By Melville?

 6         A.    Yes.

 7         Q.    You wrote to Oliver that you absolute his

 8    efforts of taking you into more interesting waters,

 9    correct?

10         A.    Right.

11         Q.    And when you talke about, a few lines down "What

12    do you know about the actual production of film have you

13    made one before", that was referring to your continuing

14    reference to making a snuff film; is that right?

15         A.    No.  I was referring to several of his hobbies

16    in this paragraph and that is one of the hobbies I was

17    referring to.

18         Q.    One of his hobbies or one of your desires to

19    make a snuff film?

20         A.    One of his hobbies.

21         Q.    Not one of your desires?

22         A.    One of his hobbies.

23         Q.    And you end this off with "So there, Oliver,

24    this is getting kind of intimate huh"?

25         A.    Yes.
```

rAj

1                          ███████ - People - Cross              854

2          Q.    Is that referring to your desire for sculpture?

3          A.    No.

4          Q.    Was that referring to Oliver's intellectual

5    desires or interest?

6          A.    Yes.  I would say yes to that.

7          Q.    Isn't what you meant here this is getting kind

8    of intimate, meaning intimate in a very personal way

9    between you and Oliver and in an intellectual way?

10         A.    Well, personal and intellectual.

11         Q.    But certainly personal, correct?

12         A.    Yes, like friendshipwise, yes.

13         Q.    Wasn't this also part of the code words you were

14   sending out?

15         A.    No.  It wasn't a code word.

16         Q.    "And dismemberment is still a looming threat",

17   is that the next line you wrote?

18         A.    Yes.

19         Q.    This is after you had reprimanded him for your

20   belief that he meant dismemberment in a literal sense,

21   correct?

22         A.    I believed that he was taking it as a joke, but

23   I was just making sure he wasn't taking it literally.

24         Q.    Before you told us a few minutes ago that you

25   thought he might actually be taking it literally, correct?

2        A.   Well, that is why I read it to make sure that it

3   was a joke, but I believe he was talking about it as a

4   joke since he kept saying dismemberment again and again.

5        Q.   Did he say in his prior e-mail to you, do you

6   want to look at the e-mail he wrote to you, anything about

7   dismemberment on page 45 if you look?

8        A.   Yes.

9        Q.   Where?

10        A.   26 and 27.

11        Q.   26 and 27 says, "I was speaking more in the

12   sense of terminus philosophorum"?

13        A.   Um-hum.

14        Q.   "Versus terminus vulgaris, though both can be

15   quite messy"?

16        A.   Yes.

17        Q.   You think that refers to dismemberment?

18        A.   That does refer to dismemberment.

19        Q.   Do you know what terminus philosophorum means?

20        A.   I think that means philosphy.  I think.

21        Q.   Terminus means like the ending, correct?

22        A.   Yes.

23        Q.   And Oliver said he was referring more to the

24   philosophical question of death or ending as opposed to

25   terminus vulgaris which means actual human experience?

rAj

1                        ███████ - People - Cross              856

2          A.    Yes.

3          Q.    Where where do you see dismemberment in that

4    line, "I was speaking more in the sense of terminus

5    philosophorum versus terminus vulgaris"?

6          A.    He was responding to me taking dismemberment is

7    a joke or dismemberment is real.

8          Q.    That's not what he was responding to.

9                  THE COURT:  Sustained.

10                 MS. HEATHERLY:  Objection.

11                 THE COURT:  Sustained.

12                 MR. LITMAN:  Withdrawn.

13                 THE COURT:  Sustained.

14         Q.    Isn't what you see here a response to your last,

15   next to the last line "How would you like to die"?  Your

16   answer "Messily", spelled backwards, isn't those two lines

17   or aren't those two lines in direct response to that, Miss

18   ███████

19         A.    Well, he didn't answer how he wanted to die, so

20   he couldn't be referring to that.

21         Q.    You see how he used the word messily at the end

22   of the line?

23         A.    Right.

24         Q.    Is what you gilism spelled backwards as an

25   adverb; is that correct?

1                              - People - Cross          857

2          A.    Is what correct?

3          Q.    That messily is spelled forwards the way the

4    word you used backwards in the prior e-mail when you wrote

5    Y L I S S E M; is that correct?

6          A.    I'm not sure what you are asking.

7          Q.    This word messy refers and picks up to your word

8    "missily" isn't it?

9          A.    No.

10         Q.    Is not in your view?

11         A.    No.

12         Q.    So you thing, this refers to dismemberment?

13         A.    That's correct.

14         Q.    If you look at the next page, "and dismemberment

15   is still a looming threat; that right?

16         A.    That's correct.

17         Q.    Did you mean that literally?

18         A.    No.  I was ending my e-mail with a flipped tone

19   like a joke.

20         Q.    "What's a girl to do", was that an invitation to

21   talk to him and go out with him and to continue what you

22   have been discussing?

23                    MS. HEATHERLY:   Objection.

24                    THE COURT:   Sustained as to form.

25         Q.    Just put the book down for a moment now please.

rAj

```
 1                        - People - Cross            858

 2              THE COURT:  Is this a good place to take a

 3         break.

 4              MR. LITMAN:  Whatever you wish.

 5              THE COURT:  We will take a break.  All

 6         right.

 7              Don't talk about the case during the

 8         interum among yourselves or with anybody else.

 9              (The jury left the court room).

10              (A short recess was  taken).

11              (The jury entered the court room)

12              THE CLERK:  Case on trial continued.  The

13         defendant is present.  The defense counsel is

14         present.  The district attorney is present.  The

15         jurors are present.

16              The witness is reminded you are still under

17         oath.

18              MR. LITMAN:  May I, your Honor?

19              THE COURT:  Yes.

20    Q.   When you were in Oliver's apartment did you use

21    code words or metephors for bondage and domination?

22    A.   I said safe word.

23    Q.   Other than safe word, did you use any code words

24    or metaphors for S and M?

25    A.   No.
```

rAj

```
 1              Cross -         - Litman                      t-2

 2                 THE COURT:  I'm not clairvoyant.

 3                 MS. HEATHERLY:  What's the relevance?

 4                 THE COURT:  What is the relevance?

 5                 MR. LITMAN:  That she falsely charged her

 6         father with physical abuse, not sexually, physical

 7         abuse.

 8                 THE COURT:  When was this?

 9                 MR. LITMAN:  It happened while she was in

10         College.

11                 MS. HEATHERLY:  This is yet another example

12         of defense --

13                 THE COURT:  I would have to, I'm going to

14         sustain the objection.  I would have to see a good

15         faith basis, this is a very sensitive area, it's

16         so improper just to spring it on me, seriously,

17         you want me to --

18                 MR. LITMAN:  This is cross examination.

19                 THE COURT:  How do I know?  How would I ever

20         know there's a good faith basis?

21                 MR. LITMAN:  We're trying a case, we do an

22         investigation, we try our case.

23                 THE COURT:  I think you must make an offer

24         of proof.

25                 MR. SOSINSKY:  Can we, can we, can we now?
```



2      A    The left one may have, but I didn't notice, I

3    noticed the right one.  At least that's what I remember,

4    now.

5      Q    Did you say to the Grand Jury, that you saw both

6    of them start to bleed?

7              THE COURT:  Sustained.

8      A    Maybe they were both bleeding.

9      Q    Well, were they?

10     A    I remember they both hurt a lot and they both

11   could have been bleeding since he bit me.

12     Q    You mean you told an Assistant District Attorney,

13   associated with this case, did you not, that both breasts

14   and nipples were bitten repeatedly, until they bled

15   profusely, correct?

16             MS. HEATHERLY:  Objection.

17             THE COURT:  Overruled.  Do you  recall making

18             any such

19             statement.

20             THE WITNESS:  I recall saying that they were

21             both bitten repeatedly and until they bled --

22             profusely, I don't know about profusely.  It

23             wasn't like it was gushing blood and I remember

24             my, this one, this one I remember bleeding.

25     Q    So, you may have made a statement that they were

Angela Bonello, Sr. Court Reporter



```
 1                Cross - Rzucek - Litman                    t-4

 2   the bed, from the futon, rather, to the bed, that either

 3   Oliver's penis or a baton was pushed inside of your rectum,

 4   is that right?

 5        A    It was a time question?  What was the first part

 6   of the question again?

 7        Q    You tell us that after you were taken from the

 8   futon to the bed, while you were hog tied, that either

 9   Oliver's penis or a baton was rammed inside of you, is that

10   right?

11               MS. HEATHERLY:  Objection.

12               THE COURT:  Sustained.

13        Q    Is that right?

14               THE COURT:  Sustained.

15               Excuse me, Mr. Litman come up, we'll

16          make a record.

17               (Whereupon the following discussion was held

18          at sidebar with the Court and counsel, out of the

19          hearing of the witness and jury)

20               THE COURT:  This record will reflect that a

21          question was asked, an objection was sustained.

22          Now listen to me --

23               MR. LITMAN:  Everybody can hear you.

24               THE COURT:  I understand that.

25               MR. LITMAN:  Please lower your voice.
```

Angela Bonello, Sr. Court Reporter



```
 1                    Cross -          - Litman                    t-4
 2              THE COURT:  I'll lower my voice if you lower
 3        your voice.  An objection was sustained and you
 4        repeated the question.  The record shows that.
 5                   Now if you're going to continue that,
 6        you're going to be asked to sit down.  You got it?
 7
 8                   (Whereupon the sidebar was concluded and the
 9        following is held in open Court)
10   Q    Was a baton rammed inside of you?
11   A    Not rammed.
12              MS. HEATHERLY:  Objection.
13              THE COURT:  All right, not rammed she said.
14   Q    I'm sorry?
15              THE COURT:  She said not rammed.
16   Q    Was it pushed hard inside you?
17   A    No, it was pushed inside me.
18   Q    The pain was so intense, is that right?
19   A    Right.
20   Q    Intense pain?
21   A    It hurt.
22   Q    Intensely, is that right?
23   A    Yes.
24   Q    You passed out, is that right?
25   A    I don't remember what happened after that, I'm
```



2     not saying I passed out.

3          Q     Did you tell an Assistant District Attorney

4     associated with this case that a baton was violently rammed

5     into your anus  and rectum?

6          A     I did not use those words.

7          Q     In fact, if you used those words, or someone said

8     you used those words that would be --

9                    THE COURT:  Sustained, sustained.

10         Q     That would be preposterous, is that right?

11                   THE COURT:  Sustained, disregard.

12                   MR. LITMAN:  Your Honor, can we approach for

13              a minute?

14                   THE COURT:  No, we ruled on that.

15                   MR. LITMAN:  I have a separate application.

16                   THE COURT:  Later.

17         Q     And you're telling us while you were hog tied it

18    was either a penis or a baton that went inside your rectum,

19    is that right?

20         A     That's correct.

21         Q     You don't know which one it was?

22         A     No.

23         Q     And this is People's exhibit 18, which you tell

24    us is similar to, but not obviously according to you, the

25    same one, is that right?

1                    Bonilla - People - Cross          1647

2       A.   Yes.

3       Q.   You had to use two different keys to unlock the

4  door, one on the bottom and one on top?

5       A.   Yes.

6       Q.   Now, then when you are inside doing the search,

7  Officer, over the course of your three or four hours doing

8  the search warrant you saw that is how the inside of the

9  door looked as well?

10      A.   Yes.

11                   MR. SOSINSKY:  I would offer them into

12              evidence.

13                   MR HORNE:  No objection.

14                   THE COURT:  Deemed marked.

15      Q.   Now, when you were up at 684 Washington Avenue

16  doing the video tape that we saw earlier today, it is true

17  that between the time that the video was running and we

18  pick up with the next segment, there are gaps

19  approximately two and a half minutes?

20      A.   Correct.

21      Q.   When you were looking at the catch you or

22  whatever was there that day to sit down on the couch and

23  lean back?

24      A.   No, sir.

25      Q.   You didn't do that at all?

```
 1                    Bonilla - People - Cross            1648

 2        A.   No.

 3        Q.   How all are you sir?

 4        A.   Five eleven.

 5        Q.   How much do you weigh sir?

 6        A.   Approximately 210-220, give or take.

 7        Q.   There are three wingnuts that run on the back of

 8   the futon on the couch; is that correct, that we saw in

 9   the videotape?

10        A.   Yes, that we saw on the videotape, yes.

11        Q.   One on each end and one in the middle?

12        A.   That's what I saw on the videotape, correct.

13        Q.   You saw that that day when you were there that

14   day as well?

15        A.   I really didn't look at the futon that well that

16   day.

17        Q.   Now, you said that Mr. Jovanovic was placed

18   under arrest on December 5 of 1996; is that correct?

19        A.   Yes.

20        Q.   And you had met with            first at

21   Barnard then back at your office on November 27th of 1996,

22   correct?

23        A.   Yes, sir.

24        Q.   And you told us that after the 27th either the

25   next day or so that you ran Mr. Jovanovic's name into some
```

```
 1                      MEYERS - PEOPLE - DIRECT         2014
 2          Q   Has your --
 3          A   I'm sorry.
 4          Q   I know it is a little warm in here.
 5              Has your testimony been accepted as an
 6      expert in the field of forensic serology?
 7          A   Yes.
 8                   MS. HEATHERLY:   I offer Carol
 9              Meyers as an expert in the field of
10              forensic serology.
11                   MR. LITMAN:   No objection.
12                   THE COURT:   Without objection she
13              is deemed and expert.
14          Q   Did there come a time when you
15      performed some work on this case?
16          A   Yes.
17          Q   What work did you do?
18          A   I analyzed --
19                   MR. LITMAN:   Can we have a date,
20              your Honor?
21          Q   When did you first perform some work
22      on this case?
23          A   I have to look at my notes.
24                   THE COURT:   Go ahead.
25                   THE WITNESS:   Okay.
```

1                    MEYERS - PEOPLE - DIRECT              2015

2                    The first piece of evidence that I

3              analyzed was pm December 12th, 1996.

4         Q    And were there other dates when you

5    performed work on the case?

6         A    Yes.   December 18, 1996 and January

7    2nd, 1997.

8         Q    Could you tell the jurors how this

9    coincides with the NYPD serology lab?

10        A    It's brought into the lab by

11   vouchering officer and once it is brought in

12   it is given a laboratory number.

13        Q    What is the purpose of the laboratory

14   number?

15        A    The purpose of the laboratory number

16   is to just keep a record of the type of

17   evidence and to make sure that it will not get

18   lost.

19        Q    Was the vouchering detective,

20   Detective Milton Bonilla?

21        A    Yes.

22        Q    When you received the property at the

23   serology lab what does it look like?

24             What containers or packaging is it

25   contained in?

1

2          A    In this case I believe there were

3    maybe bags or boxes.

4          I'm not really sure.  Again, I would

5    have to look at my notes.

6          Q    The property is designated by

7    something known as voucher number

8          A    Yes.

9          Q    What does that signify to you?

10         A    A vouchering number refers to a form

11   that is filled out, which is called a property

12   clerk voucher, and it is given a number and on

13   that form is listed the evidence that

14   corresponds with that voucher.

15         Q    When you received the property is the

16   property in a sealed packaging?

17         A    Yes.

18         Q    Where does it stay until it becomes

19   time for you to examine it?

20         A    We have a storage area at the

21   laboratory that it is kept in.

22         Q    When it came time for you to perform

23   your analysis where did you go to pick up the

24   property?

25         A    Actually, it was left on my work area.