```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 28, 2010
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                  :

DR. OLIVER JOVANOVIC,

                  :

        Plaintiff,                            04 Civ. 8437 (PAC)

                  :

      - against -                         ORDER

                  :

THE CITY OF NEW YORK, DETECTIVE
MILTON BONILLA, Shield No. 61, Individually   :
And in his official capacity, New York County
Assistant District Attorney LINDA FAIRSTEIN,   :
Individually and in her official capacity,

                  :

        Defendants.

                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

       In November, 1996, the Plaintiff, Dr. Oliver Jovanovic ("Jovanovic" or "Plaintiff"), then a doctoral student at Columbia University, was arrested and subsequently tried and convicted for the rape, sodomy and kidnapping of Jamie Rzucek ("Rzucek"), then a student at Barnard College. Local newspapers and other media outlets provided intense coverage of the high-profile trial. In April, 1998, Jovanovic was convicted, and in May, 1998, he was sentenced to a term of 15 years to life in prison. Upon appeal, the Appellate Division, First Department found trial errors relating to the trial judge's application of the rape-shield law, leading to a reversal of his conviction in December, 1999 and a remand for a new trial. The victim refused to testify at a new trial, and subsequently the District Attorney moved to dismiss all charges. On November 1, 2001, the District Attorney's motion was granted, and all charges were dismissed with prejudice.

Jovanovic initiated this action on October 28, 2004, alleging a number of claims against New York Police Department Detective Milton Bonilla, Assistant District Attorney Linda Fairstein, and the City of New York (collectively, the "Defendants").  Prior rulings by this court have left Jovanovic with claims against Bonilla for malicious prosecution, malicious abuse of process, and denial of a fair trial; a claim against Fairstein for denial of a fair trial; and claims under Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658 (1978), against the City of New York.  See Jovanovic v. City of New York, 04 Civ. 8437, 2006 U.S. Dist. LEXIS 59165 (S.D.N.Y. Aug. 17, 2006); Jovanovic v. City of New York, 04 CV 8437, 2008 U.S. Dist. LEXIS 8974 (S.D.N.Y. Feb. 7, 2008).  Defendants now move for summary judgment on all remaining claims pursuant to Fed. R. Civ. P. 56(c).  For the following reasons, Defendants' motion for summary judgment is GRANTED in its entirety.

## BACKGROUND

In June, 1996, Jovanovic, then a 30-year-old doctoral candidate at Columbia University, met a Barnard College student named Jamie Rzucek in an America Online chat room. (Jovanovic Dep. 46-47; Amended Compl. ¶ 106.)  Over the course of several months, Jovanovic and Rzucek corresponded via instant message ("IM") and e-mail and exchanged phone numbers. (Jovanovic Dep. Ex. D, E.)  On the morning of Friday, November 22, 1996, Jovanovic and Rzucek spoke on the phone and, during a conversation that lasted nearly five hours, agreed to go to dinner and a movie that evening.  (Jovanovic Dep. 87-88.)

At around 8:00 p.m. on the night of November 22, 1996, Jovanovic drove from his apartment in Washington Heights to Rzucek's Barnard dormitory on West 116th Street. (Jovanovic Dep. 99-100.)  After Jovanovic arrived at Rzucek's dormitory, the pair drove to a

Thai restaurant downtown for dinner. (Jovanovic Dep. 105.)  Once they finished dinner, they realized that they would miss the movie, *Microcosmos*, that they had intended to see together that night. (Jovanovic Dep. 96, 99.)  Jovanovic and Rzucek decided to drive around to several video rental stores looking for a copy of *Tokyo Decadence*, a film with strong sadomasochistic themes which they had previously discussed. (Trial Tr. 175-78)  Unable to find a copy of the movie, Jovanovic and Rzucek returned to Jovanovic's apartment with the intent of watching a different film. (Jovanovic Dep. 114.)  Upon arrival, Jovanovic made Rzucek tea, and Rzucek examined a book of photography by Joel Peter Witkin that contained depictions of morbid subjects. (Jovanovic Dep. 118, 121-24.)  Later, Jovanovic and Rzucek watched a movie entitled *Meet the Feebles*. (Jovanovic Dep.126-27.)

After staying overnight at Jovanovic's apartment, (Jovanovic Dep. 162-63), Rzucek left at some point during the afternoon or evening of Saturday, November 23, 1996. (Jovanovic Dep. 180; Rzucek Grand Jury Testimony 36-37.)  Over the course of the next few days, Rzucek told several people, including a friend named Luke DuBois ("DuBois"), her mother, her roommate Emily Powers ("Powers"), and head of Barnard security William O'Connor ("O'Connor"), about a forced sexual encounter with Jovanovic. (Trial Tr. 287-88, 1421; O'Connor Dep. 44, 51-52.)  On November 27, 1996, Dr. Karlene Chin Quee, a board certified OB/GYN, examined Rzucek at Barnard Health Services. (Trial Tr., 1827, 1830-31.)  During the course of the examination, Rzucek described the incident. (Trial Tr. 1831-32, 1844.)  Shortly after this examination, Rzucek had a second conversation with O'Connor, who called his contact in the New York Police Department's Photo Unit, Sergeant Francis Monahan.  (O'Connor Dep. at 86, 89.)  Monahan told O'Connor that he would "handle it," and he contacted Detective Milton Bonilla of the Special

Victim's squad.  Following a meeting with Bonilla later that day, O'Connor introduced Bonilla to Rzucek. (Bonilla Dep. 29-30.)

It was, therefore, not until four days after the incident that Rzucek reported to Bonilla that she had been sexually assaulted and that Jovanovic was her attacker. (Larkin Dec., Ex. G.) Rzucek told Bonilla that Jovanovic had assaulted her for twenty hours, beginning on the night of November 22, 1996 and continuing through the day of November 23, 1996, (Larkin Dec., Ex G), and Rzucek provided a detailed and graphic statement of the incident, in which she alleged that Jovanovic had tied her up, violently raped and sodomized her, struck her repeatedly with a club, burned her with candle wax, and repeatedly gagged her with a variety of materials. (Larkin Dec., Ex. H.)

Despite the gravity of Rzucek's allegations, Bonilla waited until nine days after his meeting with Rzucek before attempting to question Jovanovic.  It is unclear whether Bonilla conducted any additional investigation during this nine-day period, which included the Thanksgiving holiday.  On December 5, 1996, Bonilla and his partner, Detective Charles Cullen, went to Jovanovic's apartment. (Bonilla Dep. 118-20.)  After showing identification, Jovanovic allowed the detectives to enter the premises. (Bonilla Dep. 118-20.)  According to Jovanovic, after he asked the detectives whether or not he needed to contact an attorney, he was immediately taken to a police precinct. (Jovanovic Dep. 204-06.)  Later that day, Bonilla arrested Jovanovic for the rape, sodomy, and unlawful imprisonment of Rzucek. (Jovanovic Dep. 206-10.)

Following the arrest, detectives, including Bonilla, obtained a search warrant and returned to Jovanovic's apartment to search for the items allegedly used in the assault. (Bonilla Dep. 146-47.)  Upon arrival, Plaintiff's mother, Sabina Jovanovic, was inside the apartment with

the door chain locked. (S. Jovanovic Dep. 52.)  Once the detectives produced the search warrant, she let them enter, (S. Jovanovic Dep. 52), and police recovered, among other things, computer hard drives, karate belts, and tape. (Larkin Dec., Ex. T.)

On December 6, 1996, Jovanovic was arraigned in New York County Criminal Court. (Arraignment Tr. 1.)  Assistant District Attorney Linda Fairstein, the Chief of the Sex Crimes Unit of the New York County District Attorney's Office, appeared for the office. (Arraignment Tr. 2.)  Following the arraignment, Fairstein allegedly made numerous extrajudicial statements to the press concerning the case, including but not limited to statements regarding details of the alleged assault; statements vouching for the complainant; speculation about there being other victims; and descriptions of evidence seized by the police. (Amended Compl. ¶ 79-81.)[1]

In addition, Jovanovic alleges that trial witnesses were influenced by the extensive press coverage of the case.  Mary Jo Chambers, a material witness according to Jovanovic, came forward only after hearing about the case in the newspaper and testified at the criminal trial about IM conversations she had allegedly had with Jovanovic in which he spoke about what he had done to Rzucek. (Norinsberg Dec., Ex. 103, Chambers Trial Tr.)  Chambers' testimony was addressed by both parties during summations, and became the subject of a read-back requested by the jury during their deliberations. (Norinsberg Dec., Ex. 92.)

---

[1] For example, the Amended Complaint quotes Fairstein as saying: "He terrorized this young woman to the point that she was too frightened to call the authorities until weeks after it happened"; he "tied her to a chair, undressed her, and tortured her with sex toys and other objects for almost a full day"; he "tortured and sexually abused the woman, burning her with candle wax, biting her, sexually assaulting her and threatening to dismember her as Jeffrey Dahmer, the serial killer, had done with his victims"; he "tied the woman's legs to a chair and gagged her before sexually torturing her"; he "was so prepared for this and carried it off so smoothly"; "[w]e believe this was not the first time he did something like this"; and "[w]e believe there are other victims."  (Amended Compl. ¶ 79.)  In addition, Fairstein emphasized to the press that this was her office's "first internet-related sex prosecution" and that the case represented a "whole new entry in the acquaintance-rape category."  (Amended Compl. ¶ 81.)

Prior to presenting the case to the Grand Jury, Assistant District Attorney Gail Heatherly met with O'Connor to discuss Rzucek's complaint; reviewed the photographs of Rzucek taken at Barnard Health Services; reviewed the medical records of and spoke to Dr. Chin Quee; spoke to Emily Powers; spoke to Rzucek's mother; and spoke with the detectives who investigated the case. (Heatherly Dep. 87-88.)  She presented the case to the Grand Jury on December 13 and December 19, 1996 — both Rzucek and Bonilla testified, along with other witnesses. (Larkin Dec., Ex. GG.)  Bonilla testified that he saw a candle or multiple candles inside Jovanovic's apartment during his initial visit on December 5, 1996, but that the candle or candles were not there when he returned to the apartment to execute the search warrant later that night. (Bonilla Grand Jury Testimony 51, 54.)[2]  The Grand Jury indicted Jovanovic on December 19, 1996. (Larkin Dec., Ex. HH.)

Fifteen months later, on March 10, 1998, jury selection for the criminal trial began.  Each juror was asked, prior to *voir dire*, to complete a jury questionnaire including specific questions about pre-trial press coverage of the case.  During jury selection, in which both sides used all of their preemptory challenges, Jovanovic successfully challenged one juror for cause, relating to issues of pretrial publicity.  At the conclusion of jury selection, defense counsel consented to the panel, subject to challenges under Batson v. Kentucky, 476 U.S. 79 (1986).  During the trial, one juror became ill and was replaced by an alternate without objection. (Trial Tr. 1868-74.)

On April 15, 1998, the jury found Jovanovic guilty of Kidnapping in the First Degree, three counts of Sexual Abuse in the First Degree, one count of Assault in the Second Degree, and Assault in the Third Degree. (Trial Tr. 3527-34.)  He was acquitted of all other charges. (Trial

---

[2] When asked in his deposition in the present matter if he had candles in his apartment at the time of the alleged crime, Jovanovic said, "No. At that time, I don't think I had any candles in my apartment." (Jovanovic Dep. 163.)

Tr. 3527-34.)  On May 29, 1998, Jovanovic was sentenced to a term of fifteen years to life in prison. (Larkin Dec., Ex. MM.)  On December 21, 1999, the Appellate Division, First Department reversed Jovanovic's conviction, finding that the trial judge improperly hampered his ability to present a defense by erroneously invoking the rape-shield law, thereby denying the jury access to key evidence regarding Rzucek's interest in sadomasochistic activity.  See People v. Jovanovic, 700 N.Y.S.2d 156 (N.Y. App. Div. 1st Dep't 1999).  At that point, Jovanovic had served more than 20 months in prison.

Anticipating a second trial, the prosecution offered Jovanovic several plea deals.  First, he was offered a deal in which he could avoid serving any further time in prison if he would plead guilty to a single felony charge.  Maintaining his innocence, Jovanovic refused.  The prosecution then offered Jovanovic a deal that consisted of no further prison time if he would plead guilty to a single, non-sexual, misdemeanor charge.  Again, Jovanovic refused, maintained his innocence, and insisted on a trial.  On November 1, 2001, because Rzucek refused to testify in a second trial, the prosecution moved to dismiss all charges against Jovanovic. The motion was granted and all charges were dismissed, with prejudice.

Three years later, on October 28, 2004, Jovanovic instituted this action against New York City Police Officer Milton Bonilla ("Bonilla") and former Assistant District Attorney Linda Fairstein ("Fairstein") under 42 U.S.C. § 1983, alleging false arrest, malicious prosecution, malicious abuse of process, and denial of his right to a fair trial, seeking $20 million in damages, plus attorneys' fees.  Specifically, Jovanovic alleges that Bonilla, while acting in his official capacity, fabricated evidence and proffered false testimony, and that Fairstein, while acting in her official capacity, made damaging extrajudicial statements to the press in an effort to secure Jovanovic's conviction.  Jovanovic also brought claims against the City of New York under

Monell, 436 U.S. 658 (the "Monell Claims"), alleging a municipal policy or custom that gave rise to these alleged constitutionally impermissible acts.

On December 13, 2005, Defendants moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), and on August 17, 2006, the Court denied Defendants' motion, except with respect to the claim of malicious abuse of process. See Jovanovic v. City of New York, 2006 U.S. Dist. LEXIS 59165. That claim was dismissed, with leave to replead, and, on September 18, 2006, Jovanovic filed an amended complaint repleading his malicious abuse of process claim. On July 9, 2007, Defendants moved for reconsideration of the Court's August 17, 2006 opinion, arguing that the Supreme Court's decision in Wallace v. Kato, 549 U.S. 384 (2007), concerning the correct application of the statute of limitations for a Section 1983 false arrest claim, warranted reconsideration of the Court's denial of Defendants' motion to dismiss that claim. On February 7, 2008, the Court granted Defendants' motion for reconsideration as to Jovanovic's false arrest claim and denied the motion as to Jovanovic's remaining claims. See Jovanovic v. City of New York, 2008 U.S. Dist. LEXIS 8974. As a result of the aforementioned rulings, Jovanovic was left with his claims against Bonilla for malicious prosecution, malicious abuse of process, and denial of a fair trial; his claim against Fairstein for denial of a fair trial; and his Monell claims against the City of New York. On December 21, 2009, Defendants moved for summary judgment under Fed. R. Civ. P. 56(c) on all of Jovanovic's remaining claims.

**DISCUSSION**

**I. Summary Judgment Standard**

Summary judgment is appropriate where the record demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c)(2).  A fact is material if it "might affect the outcome of the suit under

the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving

party bears the initial burden of producing evidence on each material element of its claim or

defense demonstrating that it is entitled to relief.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).  The evidence on each material element must be sufficient to entitle the movant to relief

as a matter of law.  See Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir.

2004).

Once the moving party has made an initial showing that no genuine issue of material fact

remains, the nonmoving party may not refute this showing solely by means of "[c]onclusory

allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem., Inc.,

315 F.3d 171, 175 (2d Cir. 2003), but must instead present specific evidence in support of its

contention that there is a genuine dispute as to material facts.  Fed. R. Civ. P. 56(e)(2).  The

Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but

"only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007)

(citing Fed. R. Civ. P. 56(c)).

## II. Malicious Prosecution Claim Against Bonilla

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a

plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the

elements of a malicious prosecution claim under state law."  Manganiello v. City of New York,

612 F.3d 149, 160-61 (2d Cir. 2010) (citations omitted).  Because "accusers must be allowed

room for benign misjudgments," New York law "places a heavy burden on malicious

prosecution plaintiffs."  Rothstein v. Carriere, 373 F.3d 275, 282 (2d Cir. 2004) (citing Smith-

Hunter v. Harvey, 734 N.E.2d 750, 752 (N.Y. 2000)).  To prevail on a malicious prosecution

claim under New York law, a plaintiff must establish four elements: "(1) the initiation or

continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in

plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual

malice as a motivation for defendant's actions." Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir.

1997).  Here, Defendants argue that Jovanovic cannot establish a genuine issue of material fact

as to the second or third elements and that therefore a ruling of summary judgment is

appropriate.

**A. The proceeding terminated favorably for Jovanovic**

        In denying Defendant's motion to dismiss, this Court found that Jovanovic had

adequately alleged that his criminal proceeding came to a favorable termination.  See Jovanovic

v. City of New York, 2006 U.S. Dist. LEXIS 59165, at *27-28.  Although Defendants request

that the Court reconsider this issue in light of "evidence adduced in discovery," (Def. Mem. at 4),

such evidence does not change the result of the Court's analysis.

        Cantolino v. Danner makes clear that "any termination of a criminal prosecution, such

that the criminal charges may not be brought again, qualifies as a favorable termination, so long

as the circumstances surrounding the termination are not inconsistent with the innocence of the

accused."  754 N.E.2d 164, 167 (N.Y. 2001).  Further, a dismissal by the prosecution "in the

interest of justice," as occurred in this case, may properly be considered a "favorable"

termination.  Id. at 395-96.  As this Court stated previously, "[a]fter reversal and remand,

Jovanovic was cloaked again in the constitutional presumption of innocence." Jovanovic v. City

of New York, 2006 U.S. Dist. LEXIS 59165 at *28.  Thus, the subsequent dismissal in the interest of justice, with prejudice, was in no way inconsistent with Jovanovic's innocence.

Defendants argue that the District Attorney's Office never believed that Jovanovic was innocent, (Hobbs Dep. at 229-32), and that the only reason that the District Attorney's Office moved for dismissal was because Rzucek's "present emotional state [would] not permit her to undergo the stress of a prolonged trial." (Def. Mem. 3.)  The subjective beliefs of the members of the District Attorney's office, however, as well as the emotional state of the complainant are of no consequence when considering whether Jovanovic received a favorable termination.  Because the termination of Jovanovic's prosecution "in the interest of justice," was both final and "not inconsistent with" Jovanovic's innocence, the termination of the criminal case was favorable to Jovanovic, and no evidence or argument provided by Defendants convinces this Court of a different result.

Further, where a plaintiff that brings a malicious prosecution claim was charged with multiple offenses, a court must analyze each claim separately for the purposes of determining whether the proceeding terminated favorably for the plaintiff.  Posr v. Doherty, 944 F.2d 91, 100 (2d Cir. 1991); Janetka v. Dabe, 892 F.2d 187, 190 (2d Cir. 1989).  Putting aside the above analysis of the proceeding as a whole, the jury acquitted Jovanovic of several of the charges lodged against him. As a result, with respect to those charges, the favorable termination requirement is, as a matter of law, clearly satisfied.

**B. There was probable cause for the proceeding**

Under New York law, probable cause is a complete defense to a malicious prosecution claim.  Savino v. City of New York, 331 F.3d 63, 72 (2d Cir. 2003) (citing Colon v. City of New

York, 60 N.Y.2d 78, 82 (N.Y. 1983)).  Probable cause requires "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006).

**1. Plaintiff cannot defeat the presumption of probable cause arising from indictment**

A Grand Jury indictment creates a presumption of probable cause.  Savino, 331 F.3d at 72.  This presumption "may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" Id.; see also Marshall v. Sullivan, 105 F.3d 47, 54 (2d Cir. 1996).  The presence of false testimony is not enough to raise an issue of material fact; there must be a demonstration of bad faith — something more than a mere inconsistency — to defeat the Grand Jury presumption. See McClellan v. Smith, 439 F.3d 137, 146 (2d Cir. 2006) (citing, among others, intoxication, conflict of interest, pressuring the prosecutor to make a deal with a putative witness, and altering one's testimony as examples of bad faith); Brogdon v. City of New Rochelle, 200 F. Supp. 2d 411, 422 (S.D.N.Y. 2002) (holding that plaintiff must show bad faith or fraud concerning "a matter material to the issue or point in question.").  Stated differently, in order to overcome the presumption of probable cause arising from a grand jury's indictment, a Plaintiff, who bears the burden of rebutting this presumption, Savino, 331 F.3d at 73 (citing Bernard v. United States, 25 F.3d 98, 104 (2d Cir. 1994)), must adduce sufficient evidence to "erode the 'premise that the Grand Jury act[ed] judicially.'"  Rothstein, 373 F.3d at 284.  Jovanovic has failed to carry his burden.

Jovanovic points principally to a small portion of Bonilla's testimony regarding whether he saw candles inside Jovanovic's apartment at two different times.[3]  (Pl. Mem. at 3-4.)  Bonilla told the Grand Jury that, when he was in Jovanovic's home the first time, he saw candles in the apartment, but that the candles were missing when he was executing the search warrant later that day.  (Bonilla Grand Jury Tr. 51, 54.)  In addition, Rzucek told the Grand Jury that Jovanovic burned her with candle wax (Rzucek Grand Jury Testimony 17-19) and Jovanovic had online conversations with other women about using candle wax in a similar way. (Larkin Aff., Ex. DD.)  In response, Jovanovic cites his deposition, in which, when asked if he remembered having candles in his apartment, he said, "No. At that time, I don't think I had any candles in my apartment," (Jovanovic Dep. 163.), and Rzucek's dearth of lasting burn marks from candle wax.  From this, Jovanovic asks this court to conclude that Detective Bonilla "fabricated" his testimony regarding the presence of candles in the apartment, or at least that there is a genuine issue of material fact as to the existence of the candles that must be weighed by a jury.

While there may be a genuine dispute regarding the existence of candles in the apartment,[4] this is of little moment.  Jovanovic selectively quotes from Richardson v. City of New York, No. 02 CV 3651, 2006 U.S. Dist. LEXIS 69577 (E.D.N.Y. Sept. 27, 2006), claiming

_____

[3] Jovanovic also points to Bonilla's testimony that he recovered "cloth strips" from Jovanovic's apartment.  It is undisputed, however, that Jovanovic's apartment contained karate belts, a type of cloth strip.  This is essentially a quibble over terminology, is not a genuine issue of material fact, and does not defeat the Grand Jury presumption of probable cause.  Jovanovic further argues that, at the criminal trial, Bonilla "fabricated" a futon video.  Jovanovic, however, merely claims that Bonilla failed to capture his loosening of the futon's wing nuts before shooting the video — he does not allege that Bonilla actually "fabricated" anything.  Additionally, because this video was not shown to the Grand Jury, it does not have any relevance with respect to a determination of whether Jovanovic has overcome the Grand Jury presumption of probable cause.  Lastly, Jovanovic discusses the alleged destruction of police photographs and the loss of Bonilla's detective file.  It is unclear, however, what effect these items would have if they were a part of the record, and Jovanovic fails to cite any reliable evidence that suggests these items were disposed of improperly. As a result, these issues fail to overcome the Grand Jury presumption of probable cause.

[4] Indeed, even Jovanovic's mother said that she was unsure about whether there were candles in the apartment.  Specifically, in her deposition she stated, "Perhaps there were [candles], but I did not see them." (S. Jovanovic Dep. 61.)

13

that it stands for the proposition that if a plaintiff can prove that a defendant police officer fabricated any evidence, the presumption of probable cause arising from the Grand Jury indictment is automatically overcome.  But the case does not support Jovanovic's argument.  An accompanying footnote provides a helpful synopsis of the proper rule and demonstrates that Jovanovic has misinterpreted the <u>Richardson</u> court's opinion:

> Two important limitations on such a [malicious prosecution] claim warrant emphasis: In order for a plaintiff to recover, the alleged fabrication must be both material, i.e., likely to influence a jury's decision, and the legally cognizable cause of the post-arraignment deprivation of liberty. It is particularly critical to distinguish between an alleged fabrication that "precipitated the sequence of events that resulted in the deprivation of liberty" from other charges of fabrication of evidence. As vile as any fabrication of evidence is, particularly when the offender is a law enforcement officer, it seem[s] obvious that a defendant who achieves a favorable termination in a criminal case cannot properly be permitted to seek damages (and obtain a jury trial) simply by asserting, for example, that one of several (equally incriminating) alleged admissions in a post-arrest statement was not in fact made. The availability of a cause of action based solely on a claim of fabrication, without the materiality and causation requirements, would unduly deter prosecutors' exercise of discretion to dismiss or abandon cases for a broad array of reasons having nothing to do with the defendant's guilt or the claimed fabrication.

<u>Richardson</u>, 2006 U.S. Dist. LEXIS 69577 at *21 n.4 (quotation marks and citations omitted).  Here, Bonilla's testimony regarding the candles was not the only testimony concerning candles and, besides, the candles relate to only one out of the eleven charges returned by the Grand Jury against Jovanovic: Assault in the Second Degree. An inconsistency in testimony with regard to this single item could not have materially affected the Grand Jury's ability to come to its decision with regard to the entire indictment.  In other words, although there may be a genuine dispute over whether there were, in fact, candles in Jovanovic's apartment, a resolution of that question is not material *and*, even assuming *arguendo* that Bonilla fabricated his testimony, this fabrication was not the cause of any post-arraignment or post-trial deprivation of liberty.  In sum,

14

this inconsistency certainly does not "erode the 'premise that the Grand Jury act[ed] judicially.'"
See Rothstein, 373 F.3d at 284.

Additionally, Jovanovic alleges that Detective Bonilla, in a deviation from police practices in connection with the investigation, did not, among other things, read the victim's medical records or the victim's handwritten statement and that he did not properly voucher for evidence the futon on which the alleged assault took place.  All of these alleged omissions were known at the time of the arraignment, the point at which the District Attorney's office assumed full control of the prosecution.  Thus, the decision to continue the prosecution at that point was made by the District Attorney's office, not Detective Bonilla. As a result, these issues are not relevant with respect to Jovanovic's attempt to defeat the presumption of probable cause created by the Grand Jury's indictment.  See Williams v. City of New York, No. 02 Civ. 3693, 2003 U.S. Dist. LEXIS 19078, at *19 (S.D.N.Y. Oct. 23, 2003) ("Once a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening actions of the prosecutor . . . .").

**2. The evidence clearly supports a finding of probable cause**

Even without the presumption of probable cause generated by the Grand Jury indictment, and even without the candle-related evidence discussed above, the evidence presented to the Grand Jury clearly supports a finding of probable cause.  Regardless of whether a false arrest or a malicious prosecution is at issue, the relevant probable cause inquiry is always whether there is "probable cause to believe the crimes charged were committed."  Rothstein, 373 F.3d at 283. When information is received from a victim or eyewitness, probable cause exists "unless the circumstances raise doubt as to the person's veracity."  Curley v. Village of Suffern, 268 F.3d

65, 70 (2d Cir. 2001).  Further, "the existence of a 'swearing contest'" between witnesses, without more, is insufficient to create a question of fact as to probable cause.  Brogdon, 200 F. Supp. 2d at 422.

Rzucek provided Bonilla with both an oral and written account of Jovanovic's crimes and separately told several other people about the incident, including Dubois, Powers, O'Connor, and Dr. Chin Quee.  In addition, Dr. Chin Quee examined Rzucek on November 27, 1996 and the results of the examination were consistent with Rzucek's description of what Rzucek claimed Jovanovic did to her.  Dr. Chin Quee found Rzucek to be credible, and described several different bruises and areas of tenderness consistent with Jovanovic's alleged acts.  Any possible concerns about Rzucek's veracity would, in a reasonable juror's mind, be balanced out by this additional evidence, generating the necessary "knowledge or reasonably trustworthy information" for a finding of probable cause.  See Panetta, 460 F.3d at 395.

Accordingly, the Defendant's summary judgment motion as to the malicious prosecution claim against Detective Bonilla is GRANTED.

### III. Malicious Abuse of Process Claim Against Bonilla

Malicious abuse of process is actionable under Section 1983 where a plaintiff can meet the elements of the claim under New York law.  Savino, 331 F.3d at 76-77.  Under New York law, to succeed on a malicious abuse of process claim, a plaintiff must establish: (1) that the defendant employed a regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective outside the legitimate ends of that process.  Id. at 76.  "While a lack of probable cause is not explicitly an element of an abuse of process claim, the presence of probable

cause negates a claim for abuse of process." <u>Sforza v. City of New York</u>, 07 Civ. 6122, 2009
U.S. Dist. LEXIS 27358, at *49-50 (S.D.N.Y. Mar. 31, 2009).  Defendants claim that Jovanovic
has not shown the third element — a collateral objective.

To establish a collateral objective, a plaintiff must prove that the defendant "aimed to
achieve a collateral purpose beyond or in addition to his criminal prosecution."  <u>Douglas v. City
of New York</u>, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009)  "[C]ollateral objectives typically
associated with abuse of criminal process are extortion, blackmail, or retribution; and those
objectives are usually characterized by personal animus."  <u>Oathout v. Decker</u>, No. 99 Civ. 5868,
2000 U.S. Dist. LEXIS 12001, at *20 (S.D.N.Y. Aug. 21, 2000).  Plaintiff urges the Court to
broadly interpret "collateral objective" to include a wide variety of motives, such as protecting
one's reputation and the fear of losing one's job.  <u>See</u> <u>Hernandez v. Wells</u>, No. 01 Civ. 4376,
2003 WL 22771982, at *9 (S.D.N.Y. Nov. 24, 2003); <u>Richardson</u>, 2006 U.S. Dist. LEXIS 69577,
at *22.  Indeed, courts have held that protecting one's employment could be an objective
sufficient to establish the collateral objective element of a malicious abuse of process claim.  <u>See
Hernandez</u>, 2003 WL 22771982, at *9 (holding that "sav[ing] his own job" satisfied collateral
objective element where employee "had been told that he would be fired if he violated any rules
or regulations at any time in the future").

Jovanovic argues that Bonilla arrested him to curry favor with his superiors, particularly
Sergeant Monahan, but offers no direct evidence of this objective or any other motivation.
Monahan was not Bonilla's superior; indeed, Monahan was not even in Bonilla's unit.  (Cullen
Dep. 19-20.)  Jovanovic points to conversations between Monahan and O'Connor, the head of
security at Barnard, and notes that Bonilla waited nine days before questioning Jovanovic.
According to Jovanovic, this suggests that Bonilla only arrested Jovanovic because he wanted to

impress Monahan.  Standing alone, however, this delay cannot create a genuine issue of fact

regarding the issue of whether Bonilla had a collateral objective in prosecuting Jovanovic.  Even

if Monahan specifically called Bonilla and ordered him to arrest Jovanovic, this does not rise to

the level of "protecting one's job," as there is no evidence that Bonilla believed he could lose his

job, if he did not arrest Jovanovic.  As a result, the Court finds that Jovanovic fails to establish a

genuine issue of material fact with respect to the "collateral objective" necessary to support a

malicious abuse of process claim.

Moreover, because, as stated in Section II, <u>supra</u>, there was probable cause to believe that

Jovanovic had committed the crime alleged, the abuse of process claim must fail.  <u>See</u> <u>Sforza</u>,

2009 U.S. Dist LEXIS 27358, at *49-50.

Accordingly, Defendants' summary judgment motion as to the abuse of process claim

against Detective Bonilla is GRANTED.

## IV. Deprivation of Plaintiff's Right to a Fair Trial Claim Against Bonilla

A plaintiff may bring a Section 1983 action for deprivation of his or her right to a fair

trial against "a police officer [who] creates false information likely to influence a jury's decision

and [who] forwards that information to prosecutors."  <u>Ricciuti v. New York City Transit Auth.</u>,

124 F.3d 123, 130 (2d Cir. 1997).  The constitutional right in question is "the right not to be

deprived of liberty as a result of the fabrication of evidence by a government officer acting in an

investigating capacity . . . provided that the deprivation of liberty . . . can be shown to be the

result of [the officer's] fabrication of evidence."  <u>Zahrey v. Coffey</u>, 221 F.3d 342, 349 (2d Cir.

2000).  As a result, as discussed with respect to the malicious prosecution claim in Section II,

supra, the alleged fabrication must be "likely to influence a jury's decision."  Ricciuti, 124 F.3d at 130.

Bonilla's allegedly false testimony — that he found candles in Jovanovic's apartment — could not, in and of itself, have resulted in a deprivation of Jovanovic's liberty.  Bonilla's testimony regarding the candles related only to one of the Second Degree Assault claims leveled against him and was not material to any other charge.  Jovanovic was convicted of the far more serious charges of Kidnapping in the First Degree and three counts of Sexual Abuse in the First Degree, as well as Assault in the Third Degree, and he would have likely received the same prison sentence — and the same pre-trial deprivations of liberty — regardless of whether the candle evidence was introduced at trial.[5]

Jovanovic does not contradict this argument, but instead counters that Defendants' conception of "deprivation of liberty" is incorrect. According to Jovanovic, the relevant inquiry is not whether the alleged fabrication of evidence was material to plaintiff's conviction and post-conviction deprivation of liberty, but whether the fabrication caused any deprivation of liberty at all, including pre-trial detention.  This distinction is, however, irrelevant.  The allegedly fabricated evidence was not material to the decision to detain Jovanovic during the pre-trial time period and, therefore, there is no genuine issue of material fact regarding this matter.

Accordingly, Defendant's summary judgment motion as to this claim is GRANTED.

_____

[5] As discussed in Section II, supra, Plaintiff also points to Bonilla's testimony that he recovered "cloth like type materials" from Jovanovic's apartment.  Again, it is undisputed that Jovanovic's apartment contained karate belts, a type of cloth strip.  A quibble over terminology does not constitute fabricated evidence or false information, and a reasonable jury could not find it so.  Jovanovic further argues that Bonilla "fabricated" a futon video that was shown at the criminal trial.  Jovanovic, however, merely claims that Bonilla failed to capture his loosening of the futon's wing nuts before shooting the video; he does not allege that Bonilla actually "fabricated" evidence.  Further, this video issue was not pursued by defense counsel at trial or in Jovanovic's appeal to the Appellate Division, First Department.  As a result, neither of these items constitutes fabrications of evidence or false testimony that rise to the level of depriving Jovanovic of a fair trial.

## V. Deprivation of Plaintiff's Right to a Fair Trial Claim Against Fairstein

Jovanovic alleges that Fairstein made extrajudicial statements that violated her ethical responsibilities and deprived him of a fair trial.  To prevail upon a claim for denial of a fair trial due to extrajudicial statements, a plaintiff must establish three elements: (1) that there were "improper leaks" under the canons of ethics; (2) that the impermissible disclosures *in fact* denied plaintiff his due process rights; and (3) that other remedies (such as *voir dire*, use of challenges, both peremptory and for cause, and a motion for change of venue) were unavailable or ineffective, thereby demonstrating causation. See Powers v. Coe, 728 F.2d 97, 105-06 (2d Cir. 1984) ("Powers I").

Defendants argue at length that the number of relevant statements made by Fairstein was extremely low, and that, in any event, the statements were not inappropriate. Jovanovic replies that the amount of relevant statements is extremely high and that each and every one of the statements was grossly improper.  There is no need to discuss the propriety of Fairstein's comments, however, because her extrajudicial statements — even if unwise and/or improper — did not *in fact* deprive Jovanovic of a fair trial.[6]  Jovanovic has demonstrated neither causation nor injury stemming from Fairstein's statements; and cannot show that other remedies were unavailable or ineffective.

---

[6] For this reason, a discussion of Fairstein's claim of qualified immunity is unnecessary as well.  Indeed, assuming Jovanovic's accusations of prejudicial extrajudicial statements are true, Fairstein may have violated "clearly established statutory or constitutional rights of which a reasonable person would have known," Harlow v. Fitzgerald, 457 U.S. 800, 818 (1992), and thus she would not be entitled to qualified immunity for having made them.  Since the Court need not determine whether each individual statement was, in fact, improper, the Court declines to address the qualified immunity issue.

**A. Plaintiff cannot show causation**

Plaintiff has the burden to "show that such deprivation was not too remote a consequence of the improper leaks to the press." Id. (quoting Martinez v. California, 444 U.S. 277, 279, 285 (1980)) (internal quotation omitted). Further, a denial of fair trial claim "requires more than mere speculation of damages." Id. at 105.

The statements at issue were made more than one year before the trial began, and there is no competent evidence that the jury verdict was influenced by news reports containing the comments. While Jovanovic introduces evidence of news stories that jurors may — or may not — have read, he has not demonstrated a question of fact regarding whether any juror was actually prejudiced by such news coverage. Indeed, just as in Powers v. McGuigan, after consenting to the jury panel, "at no time prior to or during the trial did [plaintiff] suggest that any particular juror or alternate was biased." 769 F.2d 72, 74 (2d Cir. 1985) ("Powers II").

Jovanovic also claims that because Fairstein allegedly knew the statements would be prejudicial and would bias a potential jury, she cannot claim that there was a lack of causation. There is absolutely no authority for this proposition. The fact that Fairstein has acknowledged, in her deposition and in the media, that pretrial publicity *can* prejudice a juror is not relevant to the determination of whether particular pre-trial publicity *in fact* caused such a prejudicial effect.

Further, Jovanovic claims that Fairstein's statements caused a biased Grand Jury to indict him. However, the judge presiding over the Grand Jury proceedings found that "the instructions provided by the prosecutor to the Grand Jury (including the prosecutor's instructions to the Grand Jury to disregard media coverage concerning this case and to only consider the evidence presented) were sufficient." (Pre-Trial Order of Hon. Budd Goodman 2). As Defendants argue,

the chain of causation was "broken by the intervening exercise of independent judgment."

Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999).

Jovanovic's claim that Fairstein's comments caused the allegedly false testimony of Mary Jo Chambers, thereby depriving Jovanovic of a fair trial, also fails.  First, there is no evidence that Chambers' testimony was anything but truthful — indeed, she still maintains that her trial testimony was accurate.  Second, credibility determinations are a part of every trial, and although there is no *voir dire* of witnesses, cross-examination is generally an effective tool for displaying the credibility — or lack thereof — of a particular witness for the jury.  The fact that the jury believed Chambers' testimony, whether truthful or not, is the criminal jury's function.  Assuming *arguendo* that Chambers' testimony was manufactured from pre-trial publicity, Fairstein could not have possibly foreseen Chambers' false testimony as a result of her pre-trial comments.

In sum, Jovanovic produced no concrete evidence suggesting that any juror or witness was influenced by Fairstein's extrajudicial statements.  As a result, no reasonable juror could find that Jovanovic was deprived of his right to a fair trial, and thus there is no genuine issue of material fact to this effect.

**B. Other remedies were either available or used effectively**

At all times, Jovanovic had access to procedural remedies designed to cure potential harm caused by Fairstein's extrajudicial statements.  Although Jovanovic failed to take advantage of some of these remedial mechanisms, he employed others effectively.

Jovanovic never moved for a change of venue.  While Jovanovic claims that the widespread nature of news coverage made such a move futile, (Pl. Mem. at 26 n.21), he fails to

demonstrate "concrete particulars to support his allegations of futility." Powers II, 769 F.2d at 75 (quotation marks omitted).[7]

In addition, the trial judge took precautions to ensure the selection of a fair and impartial jury. These precautions included: distributing a juror questionnaire, which asked questions relating to media coverage of Jovanovic's case; holding a three-day-long *voir dire* session; and providing repeated jury instructions as to media exposure. Further, the trial judge admonished the prospective jurors to provide truthful answers, explained that the extensive media attention necessitated detailed questioning, and discussed publicity with the prospective jurors during the *voir dire* process and highlighted the potential impact of publicity on the jurors' ability to resolve the case in an impartial manner. Finally, the trial judge instructed all selected and alternate jurors to start with a clean slate and avoid media coverage of the case.[8] After a lengthy *voir* dire, in which both sides used all available preemptory challenges, Jovanovic's counsel consented to the ultimate panel, subject to objections unrelated to pretrial publicity.[9] In addition, Jovanovic successfully challenged a juror for cause, relating to issues of pretrial publicity and no objection relating to the pretrial publicity exposure of the jury panel was made on appeal.

---

[7] Jovanovic selectively cites to United States ex rel Rosenburg v. Mancusi, 445 F.2d 613 (2d Cir. 1971) as supporting his argument that nationwide news coverage precluded the prophylactic effect of a change of venue. However, Mancusi generally states that sufficient temporal separation of trial from news coverage negates prejudice to the defendant. The court, in a footnote, states that *certain crimes*, because of nationwide coverage, may not be "necessarily guarantee[d] isolation from prejudicial news coverage." Id. at 618 n.4. The court, however, does not specify if such coverage actually affects the defendant's right to fair trial.

[8] While ideally all jurors would indeed have a clean slate, the Supreme Court has recognized in Irvin v. Dowd, 366 U.S. 717, 722 (1961), that jurors are not required to be totally ignorant of the facts and issues involved in the cases that they decide.

[9] These objections pertained to Batson issues and bore no relation to media bias or exposure. This issue was also raised on appeal at the Appellate Division, First Department, which did not decide the issue.

Jovanovic relies on several Supreme Court cases where prejudice was found by reason of prejudicial publicity. (Pl. Mem. at 24.)  These cases are distinguished easily from the present case.  For example, in Sheppard v. Maxwell, 384 U.S. 333, 343-45 (1966), Plaintiff's principal example, a television broadcast center was set up next door to the courtroom and jurors were photographed in the jury box and individually.  In addition, the trial judge refused to take the same type of precautions as the trial judge in the instant case did and, in fact, created a media environment that denied Mr. Sheppard his right to the "judicial serenity and calm to which [he] was entitled." Id. at 354-55 (quoting Estes v. Texas, 381 U.S. 532, 536 (1965)).  In other words, there was far greater publicity during the Sheppard trial that was far more detrimental than that involved here.  Due to the large volume of publicity in Sheppard, defense counsel moved for a continuance, change of venue, and even mistrial, all of which were denied.  Id. at 348.

Murphy v. Florida is, however, much more analogous to the instant case.  421 U.S. 794 (1975).  In Murphy, jurors learned about defendant's prior convictions and other details about defendant's robbery charge through news accounts.  In light of a comprehensive *voir dire* in which many jurors were excused for having prejudged the plaintiff, and given that the jury showed "no hostility to [the defendant] . . . as to suggest a partiality that could not be laid aside," the Supreme Court held that the defendant was not deprived of a fair trial.  Id. at 800. Specifically, the Court held that ". . . juror exposure to information about a . . . defendant's prior convictions or to news accounts of the crime with which he is charged alone [does not] presumptively deprive[] the defendant of due process." Id. at 799.

Accordingly, because curative and prophylactic remedies were either available or effectively used, and because of a lack of causation, a reasonable juror could not find that Jovanovic was deprived of a fair trial due to Fairstein's extrajudicial statements.  Defendants'

summary judgment motion as to the deprivation of fair trial claim arising from Fairstein's extrajudicial statements is, therefore, GRANTED.

## VI. Monell Claims Against the City of New York

In Monell, the Supreme Court expressly held that local governments and their agencies may be sued as "persons" under 42 U.S.C. § 1983.  436 U.S. at 701.  Municipalities, however, are not liable on a theory of *respondeat superior* for the acts of their employees.  See Walker v. City of New York, 974 F.2d 293, 296 (2d Cir. 1992).[10]  Municipalities are liable only for their own misdeeds, that is, only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  Monell, 436 U.S. at 694.

> "[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to "deliberate indifference" to the rights of those with whom the city employees interact.  To establish "deliberate indifference," a plaintiff must show that: [i] a policymaker knows "to a moral certainty" that city employees will confront a particular situation; [ii] the situation either presents the employee with "a difficult choice of the sort that training or supervision will make less difficult" or "there is a history of employees mishandling the situation;" and [iii] "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights."

Wray v. City of New York, 490 F.3d 189, 195-96 (2d Cir. 2007) (citations omitted)

---

[10] Van de Kamp v. Goldstein provides that individual officials in the District Attorney's office are absolutely immune from claims of failure to train and supervise regarding administrative obligations "directly connected with the conduct of a trial."  --- U.S. ---, 129 S.Ct. 855, 861-65 (2009).

Jovanovic brings three <u>Monell</u> claims — two regarding the District Attorney's Office, and one regarding the New York Police Department.[11]  First, Jovanovic claims that the District Attorney's Office had an official policy or custom of making extrajudicial statements to the press, "so as to inflame public opinion against such defendants and deprive them of their constitutional right to a fair trial. (Amended Compl. ¶ 170).  Second, Jovanovic claims that the NYPD had an official policy or custom of allowing its personnel to "make 'off-the-record' statements to the press in high-profile criminal cases . . . so as to inflame public opinion against defendants in such cases and deprive them of their constitutional right to a fair trial." (<u>Id.</u> ¶ 179.) Finally, Jovanovic claims that the District Attorney's Office "exhibited a deliberate indifference toward the training and supervision of assistant district attorneys" with regard to several items, including the avoidance of giving improper summations. (<u>Id.</u> ¶ 188.)

Since, as stated in Sections IV and V, <u>supra</u>, Jovanovic was not deprived of a fair trial, his <u>Monell</u> claims fail.  <u>See</u> <u>Wray</u>, 490 F.3d at 195; <u>City of Los Angeles v. Heller</u>, 475 U.S. 796,

---

[11] Jovanovic's opposition memorandum discusses an additional claim based on the NYPD's failure to train detectives regarding false rape claims.  However, as defendant argues, Jovanovic did not sufficiently plead this claim. Although Jovanovic urges that this claim was sufficiently pleaded in ¶ 168-69 of the Amended Complaint, these paragraphs constitute nothing more than introductory paragraphs to an entire section devoted to Jovanovic's <u>Monell</u> claims.  In this section, there are three clearly delineated subsections, each discussing a separate claim under <u>Monell</u>.  Most importantly, Section III of this <u>Monell</u> section specifically discusses a "failure to train" claim regarding the District Attorney's Office. Surely, if Jovanovic intended to bring a <u>Monell</u> claim of this sort against the NYPD, he would have added a separate section to this effect or requested leave from the court to amend his complaint.  Paragraphs 168-69 of the Amended Complaint only provide general information about the <u>Monell</u> claims that are to be expanded upon later in the section, and do not include allegations of the requisite elements of the claim — the allegations made in the paragraphs are barely even "naked assertion[s] devoid of further factual enhancement."  <u>Ashcroft v. Iqbal</u>, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009) (quotation marks omitted) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 557 (2007)).  Further, although in <u>Hogan v. Wal-Mart Stores, Inc.</u>, relied upon by Jovanovic, the court allowed a claim that was not originally discussed in the complaint, the court allowed the claim only after the complaint had been conformed to the proof introduced at trial.  167 F.3d 781, 784 (2d Cir. 1999).  Accordingly, the Court does not recognize this claim. Even if the Court were to recognize this claim, however, Defendants' motion for summary judgment would be granted.  In finding in Section II, <u>supra</u>, that there was probable cause to believe that Jovanovic committed the crimes alleged, the Court found that there was no genuine issue of fact as to this matter, and therefore Jovanovic cannot establish a genuine issue of material fact as to the underlying constitutional violation necessary to survive a motion for summary judgment on this <u>Monell</u> claim.

799 (1986).  However, even if Jovanovic had been denied a fair trial, this Court would still grant

Defendants' motion for summary judgment as to the <u>Monell</u> claims for the reasons that follow.

## A. <u>Monell</u> Claims Regarding "Off-the-Record" and Extrajudicial Statements

Jovanovic alleges that the New York Police Department "had an official policy or custom

of "mak[ing] 'off-the-record' statements to the press in high-profile criminal cases . . . so as to

inflame public opinion against defendants in such cases and deprive them of their constitutional

right to a fair trial." (Amended Compl. ¶ 179.)  In addition, Jovanovic alleges that the "District

Attorney's Office had an official policy or custom of making extrajudicial statements to the

press" that would have a similar effect. (Amended Compl. ¶ 170.)  Jovanovic does not, however,

respond to Defendants' arguments in support of summary judgment on these claims and they are,

therefore, abandoned.  Fed. R. Civ. P. 56(e)(2) (nonmovant's response must "set out specific

facts showing a genuine issue for trial. If the opposing party does not so respond, summary

judgment should, if appropriate, be entered against that party"); <u>see generally</u> <u>M.M. ex rel. J.M.</u>

<u>v. New York City Dep't of Educ.</u>, No. 09 Civ. 5236, 2010 WL 2985477 (S.D.N.Y. July 27,

2010) (holding that where plaintiff failed to respond to defendant's arguments for dismissal,

plaintiff's claims were abandoned); <u>Brandon v. City of New York</u>, 705 F.Supp.2d 261 (S.D.N.Y.

2010) (collecting cases).

But, even if Jovanovic had not abandoned these claims, the Court would grant

Defendant's motion for summary judgment.  As Defendants argue, "evidence of one instance" in

which municipal employees violated a citizen's rights is not enough to create a triable issue of

fact as to whether an official policy or custom existed.  <u>See</u> <u>Green v. City of New York</u>, 465 F.3d

65, 80-81 (2d Cir. 2006).  Indeed, the policy or custom "must be so manifest as to imply the

constructive acquiescence of senior policy-making officials." See id. at 80 (quoting Sorlucco v. N.Y. City Police Dep't, 971 F.2d 864, 871 (2d Cir.1992)).  Here, Jovanovic has made bald assertions regarding policies or customs, but has only provided Defendants and the Court with examples stemming from the instant case. As a result, Plaintiff has not adequately shown policies or customs necessary to defeat Defendants' motion for summary judgment on these claims.

**B. Monell Claim Regarding the District Attorney's Office's Alleged Failure to Train**

Jovanovic claims that the District Attorney's Office "exhibited a deliberate indifference toward the training and supervision of assistant district attorneys" with regard to several items, including: (1) the obligation to discontinue a criminal prosecution when evidence is discovered that negates probable cause, (2) the obligation to comply with obligations under Brady v. Maryland, 373 U.S. 83 (1963), and (3) the obligation to avoid giving improper summations. (Amended Compl. ¶ 188.)  Jovanovic's response to Defendants' motion centers principally on Assistant District Attorney Gail Heatherly's improper remarks during summation.  These allegedly included: (1) attacking the integrity of defense counsel; (2) vouching for witnesses; (3) attacking Jovanovic's expert witnesses; (4) appealing to class prejudice; (5) emphasizing Jovanovic's failure to testify; and (6) misleading the jury into believing that Jovanovic had attended medical school.

Jovanovic has failed to submit sufficient evidence for a rational trier of fact to conclude that the District Attorney's Office had an improper policy or custom that deprived him of a fair trial.  The New York County District Attorney's office obtained myriad convictions during the 1990's.  Yet, Jovanovic lists only seven Appellate Division decisions involving improper comments in summation.  Moreover, Jovanovic points to only a handful of examples of improper

training.  This small number of cases and instances of improper training is insufficient to establish that the DA's office was on notice of its allegedly deficient training or that these deficiencies are the result of deliberate indifference.  See Wray, 490 F.3d at 196 ("Wray submitted a list of New York cases in which suggestive show-up identification evidence was impermissibly admitted by courts; but only one post-dates 1992 — a telling datum when one considers the thousands of identifications conducted by each New York City Police Department precinct each year.  The police training thus appears to be largely successful.").

Furthermore, during the criminal trial, the trial judge made decisions to overrule Jovanovic's objections to alleged prosecutorial misconduct.  These decisions constitute a superseding cause of any alleged harm to Jovanovic.  Decisions of a trial judge who was not misled or coerced constitutes a superseding cause of harm, breaking the chain of causation for Section 1983 liability purposes.  Id. at 193-94 (police officer who conducted unduly suggestive show-up identification not liable in Section 1983 action for deprivation of fair trial because trial judge, by admitting testimony of stationhouse show-up identification, was intervening cause of harm); see Townes, 176 F.3d at 147 (police officer who illegally seized inculpatory evidence not liable in Section 1983 action for deprivation of fair trial because, by denying plaintiff's motion to suppress, the trial judge was intervening cause of harm).  As a result, the trial judge's decisions overruling Jovanovic's objections to prosecutorial misconduct constituted a superseding cause of Jovanovic's alleged harm.[12]

_____

[12] Defendants make two additional arguments for summary judgment as to the Monell claims.  Both of these arguments are unpersuasive.  First, Defendants argue that Jovanovic cannot show any violation of his due process rights arising from prosecutorial misconduct because, in reviewing the trial court's decision, the Appellate Division did not make a finding of misconduct, focusing on the trial court's misapplication of the Rape Shield Law in excluding certain evidence.  The Appellate Division, however, did not address prosecutorial misconduct, so its decision is not probative on that issue.  Defendants further argue that the Supreme Court decision Van de Kamp v. Goldstein, --- U.S. ---, 129 S.Ct. at 863, bars Jovanovic's Monell claim.  Van de Kamp holds that, with respect to

Accordingly, Defendants' summary judgment motion as to Jovanovic's <u>Monell</u> claims is GRANTED.


## <u>CONCLUSION</u>

For the foregoing reasons, Defendants motion for summary judgment is GRANTED in its entirety.  The Clerk of Court is directed to terminate the pending motion and enter judgment accordingly.


Dated:  New York, New York
       September 28, 2010

SO ORDERED

_____

PAUL A. CROTTY
United States District Judge

---

supervision and training as to trial-related functions of prosecutors, members of a district attorney's office enjoy absolute immunity from failure to train suits under Section 1983.  However, <u>Van de Kamp</u> did not address <u>Monell</u> liability; it addressed only failure to supervise liability of individual district attorneys.  <u>See Norton v. Town of Islip</u>, No. 04-cv-3079, 2009 WL 804702, at *18-19, *25-27 (E.D.N.Y. Mar. 27, 2009) (finding prosecutor immune under <u>Goldstein</u>, but holding that Suffolk County could be liable under <u>Monell</u> for failure to supervise prosecutors); <u>but see</u> <u>Thompson v. Connick</u>, 578 F.3d 293, 293-95 (5th Cir. 2009) (Jones, C.J., concurring) (opining that <u>Goldstein's</u> rationale applies equally to <u>Monell</u> claims and should thus apply with equal force).